## In re FINLEY, KUMBLE, WAGNER, HEINE, UNDERBERG, MANLEY, MYERSON & CASEY, Debtor.

### No. 88 B 10377 (PBA).

United States Bankruptcy Court, S.D. New York.

April 14, 1988.

Anderson, Russell, Kill & Olick, P.C., New York City, for Carey Group.

Milbank, Tweed, Hadley & McCloy, New York City, for Francis H. Musselman, Chapter 11 Trustee.

Skadden, Arps, Slate, Meagher & Flom, New York City, for Manufacturers Hanover Trust Co., Bankers Trust Co., Citibank, N.A. and The Nat. Bank of Washington.

Jeffrey P. Meyer, Los Angeles, Cal., pro se.

## MEMORANDUM DECISION DENYING REQUEST FOR APPOINTMENT OF GENERAL PARTNERS' COMMITTEE

PRUDENCE B. ABRAM, Bankruptcy Judge:

On March 24, 1988, this court signed an order to show cause fixing a hearing on the motion of certain partners (the "Carey Group")[1] of the Debtor seeking the appointment of an equity security holders' committee pursuant to Bankruptcy Code § 1102(a) to be composed of the general partners of the Debtor. A hearing was held on the motion on March 31, 1988 at which time the court denied the motion after oral argument. The court has determined that it would be appropriate for it to reduce its ruling on the motion to a written decision in light of the large number of interested parties in this case.

The Debtor, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, was once the fourth largest law firm in the United States. It had approximately 700 attorneys, of whom some 200 were partners. The firm, which had offices in fifteen cities in the United States and an office in London, England, terminated its operations at the end of 1987. By the time the Debtor closed its doors, the partners had been split apart by factional feuding over responsibility for the firm's $83 million bank debt.[2] A Plan of Termination for the Finley Firm was adopted effective January 4, 1988. Pursuant to that plan, Wayne Johnson, C. Thomas Tew, Alan Gelb and Ira Revich became the Liquidating Trustees (the "Liquidating Trustees") for the Finley Firm.

On February 24, 1988, the eve of the appointment of a receiver for the Finley Firm in an action pending in the Superior Court of the State of California for the County of Los Angeles, the Banks filed an involuntary Chapter 7 petition against the Finley Firm. The Banks sought the appointment of an interim trustee and a hearing was scheduled on that motion for the afternoon of March 2. On the morning of March 2, the Liquidating Trustees filed a voluntary petition under Chapter 11 on behalf of the Debtor.

At the March 2 hearing, the Myerson Group[3] of partners requested that the involuntary Chapter 7 case be converted to Chapter 11 and also requested the appointment of a Chapter 11 trustee. The court determined that the best interests of the parties would be served by the liquidation of the Debtor under Chapter 11 and by the appointment of a Chapter 11 trustee. The court converted the Chapter 7 case to Chapter 11 and directed the U.S. Trustee to appoint a Chapter 11 trustee. Thereafter, Francis H. Musselman was appointed as Chapter 11 Trustee.

The present motion by the Carey Group for appointment of a partners' committee was apparently prompted by an article in the March 21, 1988 issue of the New York Law Journal. The article, which reported on the court's refusal to disqualify Mr.

---

1. The Carey Group includes Honorable Hugh L. Carey, Donald Bezahler, Morris A. Wirth, James Normile, Carl A. Schwarz, Richard Russell, Elihu Fier and Michael Bamberger.

2. There are four banks involved: Manufacturers Hanover Trust Company, Bankers Trust Company, Citibank, N.A. and The National Bank of Washington (collectively, the "Banks").

3. The Myerson Group consists of Harvey D. Myerson, J. Lawrence Blades, Herbert Bockstein, Lloyd Clareman, Daniel J. Cooper, Gregor F. Gregorich, William Kandel, Philip S. Kaufman, Lasrence H. Panitz, Arthur H. Ruegger, Mark E. Segall and Douglas Stahl.

Musselman as the Chapter 11 trustee, also stated:

"On a third front, the Carey group's efforts to stake out an influential position in the bankruptcy through the formation of an 'equity' committee appeared stilled for the time being.

"Assistant U.S. Bankruptcy Trustee Neal Mann said that he is talking to various partner groups to determine if it is possible to assmble [sic] a fairly representative committee that can work together without acrimonious divisions. Mr. Mann said he did not expect to reach a conclusion on whether such an approach can work *for another three weeks.*" (Emphasis added.)

The Carey Group's position as stated in its motion is that an equity security holders' committee composed of general partners would facilitate the cooperation of the general partners in the collection of the Debtor's accounts receivable and work in process, which constitute the vast bulk of the Debtor's assets. Further, it would maintain a maximum of continuity in the estate.

"No trustee, no matter how diligent, experienced and professional, can possibly hope to maximize the assets of this debtor without the active, cohesive participation of the Finley Kumble partners." Affidavit of Arthur S. Olick Sworn to March 24, 1988 in Support of Carey Group Motion at 3.

The Carey Group expressed the concern that without the cooperation of the general partners there would be a substantial shortfall in that insufficient assets would be realized to pay legitimate debts in full.[4]

The United States Trustee filed a response to the motion stating that the motion was unnecessary because the United States Trustee

"is being provided with a list of partners and is, pursuant to 11 U.S.C. § 1102 of the Bankruptcy Code, taking all the necessary steps in furtherance of the formation of a partners committee."

Mr. Musselman advised the United States Trustee that he would favor formation of a partners' committee if it were sufficiently representative and assisted by counsel unaffiliated with counsel representing any of the partners. He also stated that if the partners' committee impeded the case's swift resolution for whatever reason, he would like to reserve the right to seek its dissolution. In addition the Chapter 11 Trustee reserved his right to review and object to payment of any committee's expenses.

A former partner of the Debtor, Jeffrey P. Meyer, submitted a letter opposing the formation of an official partners' committee. Mr. Meyer stated that it was inconceivable to him that another layer of administrative expense was required to assist the Chapter 11 trustee in collecting the accounts receivable.

"Each partner has a fiduciary obligation to render all possible assistance to the Trustee. Interposing a committee does not augment the ability of the Trustee to collect the accounts receivable, and may decrease the amount available to creditors by virtue of the extraordinary additional expense.

"Beyond that, no committee, however composed, could be representative of the interests of the partner group as a whole." Letter of Jeffrey P. Meyer dated March 30, 1988.

The Myerson Group also opposed the appointment of a partners' committee. They stated their view that there had been no real demonstration of how the formation of such a committee would ease the administration of the case. In particular, they

---

4. The key unanswered question in this case is the amount by which the partnership's assets are less than its liabilities. At a hearing on March 31, 1988, the Trustee's accountants estimated the potential deficiency at $13 to $33 million. This estimate assumed the realizable value of the firm's assets to be $79–89 million and its liabilities to be $102–112 million. This estimate could prove to be understated if asset realizations are less than estimated and/or liabilities are greater. Any deficiency will result in demands on the Finley Firm's partners for payment of the deficiency. Who will contribute and how much each will have to contribute remains to be determined.

were of the view that imposing an additional layer of activity on the already active representation of various partners and groups of partners would not be productive. Finally, they pointed out that such a committee would not eliminate the need to consult with all partners.

Also opposed to the motion were the Banks. The Banks were of the view that the only apparent purpose of the motion was to impose on the estate the cost of any attorneys and other professionals hired by the committee and to make a veiled attempt to return the case to the debtor in possession status which the court had already rejected. See Affidavit of William C. Repko Sworn to March 30, 1988 at 4. In the view of the Banks, the formation of a partners' committee could actually impede collection of accounts receivable as the collection process would fall victim to bickering between those on the committee and those billing partners not on the committee.

In addition to these reasons, the Banks urged that there simply is no statutory basis for the appointment of a committee of general partners. The Banks pointed out that a general partner is not an equity security holder as that term is defined in Code §§ 101(15) and (16),[5] and thus, a general partner is not entitled to be appointed as a member of an equity security holders' committee.

The Banks' legal position is well founded. The only case that the court has been pointed to on the subject, *In re Westgate General Partnership*, 55 B.R. 560 (Bankr.E.D. Pa.1985), holds that general partners may not be members of an official committee of equity security holders. In addition, the court in *Westgate* found the partners' appeal to the broad equity powers of the bankruptcy court to override the statutory mandate to be meritless.

This court is persuaded that *Westgate* holding is correct and that Code § 1102 does not authorize the appointment of an official committee for general partners.

Likewise, this court finds no other basis on which it can direct appointment of a general partners' committee. In particular, this court does not find in Code § 105[6] the authority to direct the appointment of a general partners' committee since the court is of the view that the omission of statutory provision for such a committee must be viewed as legislative policy.

As this court has held that the general partners of the Debtor are parties in interest under Code § 1109 and entitled to be heard, see Transcript of Hearing of March 2, 1988, it is seductive to assume that a general partners' committee should be formed. Indeed, there is a dictum in the *Westgate* decision that a general partners' committee could be appropriate when, as is the case here, a Chapter 11 trustee has been appointed and the partners no longer manage the debtor. See 55 B.R. at 562.

The committee structure provided for in Chapter 11 cases offers substantial benefits to the court and the Debtor in the form of a centralized body to be heard and met with. It would be easier for this court to consider the opinion of a single committee on an issue than it will be for this court to consider the often conflicting views of the Debtor's many partners on the issues which will arise in this case. "A primary means of effectuating consensual progress of a Chapter 11 case is the statutory committee system." M. Bienenstock, *Bankruptcy Reorganization* (1987) ("Bienenstock") at 243. It has been pointed out that the debtor in possession cannot possibly negotiate with hundreds or thousands of creditors and equity security holders and, that as a practical matter, it is often impossible to negotiate with even twenty persons. Bienenstock at 244. Being an effective and unified voice in a Chapter 11 case is an important aspect of the functioning of a creditors' or equity security holders' committee.

The primary purpose sought to be achieved by a committee is negotiation of a

---

5. Insofar as the definition relates to partnerships, Code § 101(15)(B) defines equity security as the interest of a limited partner in a limited partnership.

6. Code § 105(a) provides in relevant part that "The court may issue any order, process, or judgment necessary or appropriate to carry out the provisions of this title."

satisfactory plan of reorganization. See Code § 1103(c)(3). Each member of a committee has a fiduciary duty to members of the class he represents. See DeNatale, The Creditors' Committee Under the Bankruptcy Code—A Primer, 55 Am.Bankr.L.J. 43 (Winter 1981) at 56–58. Normally the committee is comprised of the seven largest creditors or equity security holders. See Code § 1102(b). It is reasonable to assume that in the usual case a committee so composed will be representative and the members able to carry out their duty to negotiate a fair plan for the entire class of creditors or equity security holders. Although the committee may consult with the debtor in possession or trustee concerning the administration of the case, it is not intended that the committee have day-to-day input in the debtor in possession's or trustee's business decisions. See *In re UNR Industries, Inc.*, 30 B.R. 609, 612 (Bankr.N.D.Ill.1983).

Analysis of the role a general partners' committee would be expected to play in this case makes it clear that such a committee bears only the most superficial resemblance to those provided for by Code § 1102. The Carey Group's expectation was that the committee could play a useful role in enhancing the collection of the Debtor's receivables by the partners. No direct responsibility for care or custody of the debtor's assets is placed on the Code § 1102 committees. Another function for the partners' committee would be to negotiate what monetary contribution each partner would make to cover the likely deficiency. The difference between contributing to the fund for creditor payments and receiving a distribution is one of significant substance.

No *pari passu* notion underlies the *inter sese* rights and obligations of the general partners as it does the rights of creditors and equity security holders to a distributive share of the debtor's assets. The concept of a committee member as a class representative cannot be applied to a general partners' committee.[7] Fundamentally, it is

7. Certainly it is possible to conceive that the legal mind could fashion a workable framework for a general partners' committee. That framework might take the form of adding terms to the partnership agreement itself providing for a means of selecting a representative committee and outlining its means of function. Alternatively, it could be an amendment to the Bankruptcy Code. An amendment to the Code may not be appropriate as a problem arises only in those few cases with a large number of general partners. It is the sheer size of the partnership in this case (some 200 partners) which renders the case unwieldy.

The Code's provisions relative to partnerships do not appear to have been formulated with this type of case in mind, i.e., a potentially solvent partnership with a large number of partners. The Code calculates insolvency of the partnership by including the excess of value of each partner's nonpartnership property over nonpartnership liabilities on the asset side. With only a few partners, a quick computation would be possible. With 200 partners, the calculus becomes infinitely more complicated and more urgent. If this Debtor is insolvent after inclusion of the partners' excesses, then it seems inevitable that personal filings by some or all the partners will result and should not be forestalled by this court. However, it would be unfortunate for the partners to have to resort to personal filings just to stave off creditors for the time being if the Debtor is not insolvent.

The number of lawsuits commenced against the partners individually seeking to recover payment on firm debts is a pressing problem. The aggregate economic inefficiency generated by suits against 200 partners is bothersome. Moreover, creditors pursuing the partners directly are in competition with the Chapter 11 Trustee's efforts to compel contributions for the benefit of all the Debtor's creditors. These contributions are assets of the partnership. See New York Partnership Law § 71(a) II and Code § 541(a)(1).

The conventional wisdom is that the partners may not receive a discharge through confirmation of a plan for the partnership. See, e.g., *First Nat. Bank of Herkimer v. Poland Union*, 109 F.2d 54 (2d Cir.1940). See also, Kennedy, Frank, "The Discharge of Partnerships and Partners under the Bankruptcy Code", 38 Vand.L. Rev. 857 (May 1985) at notes 100–102 and accompanying text. However, none of the cases with which this court is familiar consider a fact pattern in which creditors are paid in full, either with or without interest, as a result of partner contributions. The triangular relationship of partnership, partner and creditor resembles that of debtor, insurer and injured party. The Second Circuit has recently upheld issuance of a permanent injunction against actions against the insurer as part of a litigation settlement even though it was challenged as an impermissible discharge to a non-debtor party. See *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89 (2d Cir.1988).

**18**

each partner for himself in the race to avoid or minimize personal liability to the Debtor's creditors.

Nothing in the Bankruptcy Code precludes the partners of the Debtor from creating an unofficial committee or committees. The expense of continued separate legal representation of each of the Debtor's partners is mind-boggling. Whether through the formation of unofficial committees or dialogue groups or the offices of the Chapter 11 trustee, it is to be hoped that the partners will reconcile their differences through compromise so that this case may promptly come to a conclusion satisfactory to creditors. Only when that happens will the partners be truly free to go on with their professional careers and personal lives.

A separate order denying the motion is being signed concurrently herewith.