### In re MYERSON & KUHN, A Partnership, Debtor.

### MYERSON & KUHN, Plaintiff,

v.

### BRUNSWICK ASSOCIATES LIMITED PARTNERSHIP, Clinton Associates Limited Partnership, Ft. Oglethorpe Associates Limited Partnership, West Knoxville Associates Limited Partnership, William E. Simon, J. Walter Thompson Company, Shearson Lehman Hutton Inc., The City of New York, Julius Blumberg, Inc., Pro-Temps, Inc., and John Does One Through Two Hundred and Fifty, Inclusive, Defendants.

Bankruptcy No. 89 B 13346 (PBA).
Adv. No. 89–6610A (PBA).

United States Bankruptcy Court,
S.D. New York.

Aug. 21, 1990.

As Corrected Nov. 28, 1990.

Seward & Kissel, New York City, by Ron Cohen, M. Thomas Munno, for debtor.

Sanford Rosen, New York City, for creditors' committee.

Kelley Drye & Warren, New York City, by Cory Friedman, for Bowie Kuhn.

## RESTATED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRUDENCE B. ABRAM, Bankruptcy Judge.

Pursuant to the evidence adduced at the 16 hearings held before this Court on the motion of plaintiff Myerson & Kuhn ("M & K") for a temporary restraining order and a preliminary injunction,[1] and on the evidence adduced at the two hearings on the January 3, 1990 motion of Bowie K. Kuhn ("Kuhn") to intervene as a party plaintiff in this adversary proceeding,[2] and on the evidence adduced in the related adversary proceeding, No. 90–6039A (the "Partner Adversary Proceeding"),[3] and the findings of fact and conclusions of law set forth by this Court in its temporary restraining order, as it has been extended and modified (the "TRO")[4] and on all of the pleadings and proceedings had herein, the Court makes the following Restated Findings of Fact and Conclusions of Law, to clarify the reasons for the Court's entry of the TRO, and, as requested by Judge Leval in his remand Order of July 24, 1990, the reasons for the subsequent extensions and modifications of the TRO on and after February 13, 1990, which excluded Kuhn, among other Partners.

The Court finds that:

1. The initial hearing was held on December 28, 1989. All subsequent hearings at which the temporary restraining order was extended or modified were held on notice. Those hearings were held on January 9, 1990, January 22, 1990, January 29, 1990, February 13, 1990, March 1, 1990, March 8, 1990, March 22, 1990, April 19, 1990, April 23, 1990, May 11, 1990, May 23, 1990, June 21, 1990, July 2, 1990, July 16, 1990 and August 16, 1990.

2. The two hearings on Kuhn's motion to intervene were held on January 3, 1990 and January 9, 1990.

3. Evidentiary hearings in the Partner Adversary Proceeding were held on June 14, 1990, June 21, 1990 and July 2, 1990. Findings of fact and conclusions of law in the Partner Adversary Proceeding are set forth in the Order dated July 23, 1990 and entered July 26, 1990 granting a preliminary injunction against Kuhn.

4. The TRO was initially entered on December 28, 1989. Thereafter, it was extended by orders dated January 10, 1990, January 24, 1990, February 8, 1990, February 13, 1990, March 2, 1990, March 8, 1990, March 14, 1990, March 27, 1990, April 2, 1990, April 30, 1990, May 18, 1990, May 24, 1990, June 25, 1990, July 12, 1990 and August 16, 1990.

*Findings of Fact*

1. M & K is the debtor and debtor-in-possession ("Debtor") in this Chapter 11 case which was filed on December 27, 1989 (the "Petition Date"). Prior to the Petition Date the Debtor had been engaged in business as a law firm with offices in, among other places, New York, New York; Washington, D.C.; Philadelphia, Pennsylvania; Dallas, Texas; and Los Angeles, California. At one time Debtor had in excess of fifty equity and non-equity ("Contract") partners, including professional corporations (collectively, the "Partners"). By the time of the Petition Date, all but one of the Partners had withdrawn from M & K. Frank Ciaccio was the sole remaining partner and he had been designated the responsibility of winding-up M & K's affairs. Among the Partner resignations of major significance was the withdrawal in June 1989 of Leon Marcus ("Marcus"). Marcus, whose area of specialty is bankruptcy, received an indemnity agreement with respect to M & K obligations at the time of his withdrawal. Shortly after he left M & K and in July and August several members of the M & K bankruptcy group left to join Marcus at a new firm.

2. A dispute exists between Marcus and M & K about the effect of the agreement by which the firm of Booth Marcus & Pierce became part of M & K and about the effect of the indemnity agreement given at the time of his withdrawal from M & K. These disputes affect the ultimate exposure that Marcus and other Partners associated with him would have for the claims of M & K creditors.

3. The Contract Partners have asserted that they should have no liability for M & K debts.

4. In the Spring of 1989 Shearson Lehman Hutton Inc. ("Shearson"), a major client of M & K, alleged that M & K had deliberately overbilled it in a significant dollar amount through falsified time records. The partner in charge of the Shearson account was Harvey D. Meyerson ("Meyerson"), one of two name partners of M & K. In order to resolve this situation, a settlement was reached under which M & K executed a note in favor of Shearson in the amount of $837,500. Shearson received the personal guarantees of 17 M & K partners, including Kuhn, with respect to the note. By December 6, 1989, when M & K defaulted on the Shearson note, the principal due had been reduced to approximately $490,000. (A.P.Document 22A) The Shearson incident, along with large withdrawals from M & K made by Meyerson, fostered an atmosphere of distrust among the Partners of M & K before the collapse of the firm; these matters are now one of the subjects of the intra–Partner claims which the TROs seek to avoid having litigated at this time as inimicable to the atmosphere of cooperation among the Partners necessary for a consensual plan under which Partner contributions would be made available to pay M & K creditor claims.

5. Subsequent to the initial hearings on the TRO, an additional creditor, the United Food & Commercial Workers International Union, AFL–CIO & CLC ("UFCW"), appeared asserting a claim of false billing. This creditor first became aware of the false billing through contacts made by the United States Attorney for the Eastern District of New York who was investigating M & K and/or one or more of its Partners. The UFCW claim has been allowed for $550,000 for the purposes of voting on the pending plan.

6. There are at least 250 creditors of the Debtor. The dollar amount of the claims against the Debtor has been of concern from the outset of the TRO hearings in order to make some assessment of the amount of the total deficiency of firm assets to meet firm liabilities. The size of the shortfall is relevant to the amount of the contributions required from Partners.[5] At the January 22, 1990 hearing counsel for the Debtor stated that the then estimate was $3.4 million, including a claim of $750,000 for the deductible with respect to

---

5. It is important to keep in mind that whatever the absolute size of the shortfall, the recovery of M & K creditors from Partners would ultimately be limited by the size of the Partners' individual assets.

the Brunswick malpractice claim.[6] By the March 22 hearing that estimate had been revised upwards to $5.5 million. There still is not a final claims number. In bankruptcy cases, actual claims typically exceed early estimates for a number of reasons, including the fact that the case results in breach of contract claims not previously recorded in the debtor's books and records.

7. Although Kuhn has repeatedly asserted that this court has not conducted adequate factual hearings prior to issuing the TROs, Kuhn's only attempt at presenting evidence other than through cross-examination consisted of seeking to call as a witness the attorney for Marine Midland Bank, which this court rejected as improper. In the final analysis, Kuhn's complaints about the factual record go to the weight this court should give to the evidence and not to the actual absence of an adequate factual record. This court did decline to spend time going through transfers Kuhn's counsel asserted were made by Marcus because all of the transfers at issue were made a year or more before the Petition Date; Marcus did not deny that transfers had been made although he challenged Kuhn's characterization of them; and the transfers were not relevant in this court's view to the issuance of the TRO except insofar as they underscore the complexities that will confront creditors in attempting to recover from Partners if a plan predicated on Partner contributions is not successful.

8. The Debtor commenced this adversary proceeding on the Petition Date against certain of its creditors, as set forth in the caption, who had commenced or threatened to commence litigation against, or to seize or attach assets of, the Partners. On December 28, 1989 the Court issued an Order which, among other things, restrained and enjoined the named creditors from commencing, maintaining or prosecuting litigation against the Partners. The TRO has been modified and continued thereafter. Among other things, the scope of protection and the Partners protected have been modified. The TRO also was modified with the Debtor's consent to allow service of process on the Partners by each of the creditors who so requested to protect the creditors from any possible statutes of limitations bars to their claims against the Partners and to allow creditors to have the protection of Section 273-a of the New York Debtor & Creditor Law.[7] (1/9/90 Tr. 69–72)

9. Defendants in this adversary proceeding are certain creditors of M & K who hold claims against M & K and some or all of the Partners arising out of the relationships between and among the Debtor, the defendants and the Partners. In some instances, the liability of the Partners derives solely from their status as former M & K partners. In other cases, the creditor also has separate agreements with one or more of the Partners relative to an M & K claim on which it bases its claim against a Partner.

10. Kuhn was a former name Partner of Debtor.

11. Although Kuhn has not made any financial disclosure, it is believed on the basis of known facts that Kuhn is among the wealthier former M & K partners.

12. Kuhn is not a party to this adversary proceeding.

---

6. The basis for the so-called Brunswick malpractice claim is the alleged failure of M & K to cause a timely proof of claim to be filed in a Tennessee bankruptcy case. See *In re Pioneer Investment Services Company*, 106 B.R. 510 (Bankr.E.D.Tenn.1989) for the bankruptcy court's decision finding the claim untimely. No final adjudication of the timeliness of the claim has yet been made.

7. That statute provides "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." No suggestion is being made by this court that creditors would be limited to this section if a transfer by a partner was sought to be challenged as a fraudulent conveyance. However, this section eases the burden on a creditor in challenging a transfer made when an action is pending.

13. Kuhn moved, by order to show cause dated January 2, 1990, to intervene as a party plaintiff in this adversary proceeding, seeking to file a proposed intervenor summons and complaint, and to expand the scope of the temporary restraining order previously issued against certain creditors of Debtor. Kuhn sought (i) leave to intervene as a party plaintiff and (ii) to have the bankruptcy court issue a temporary restraining order and a preliminary injunction against Marine Midland Bank, N.A., a secured creditor of Debtor, from commencing, maintaining or prosecuting litigation against Kuhn. Kuhn specifically argued in his intervention motion that "[t]he Court has the power under § 105" of the Bankruptcy Code to issue the TRO and preliminary injunction sought by Kuhn. (Kuhn 1/2/90 Motion to Intervene at 7)

14. Kuhn further claimed in his motion that permissive intervention under Federal Rule of Civil Procedure ("FRCP") 24(b), as incorporated by Bankruptcy Rule 7024, should be granted because there purportedly existed identical questions of law and fact (Kuhn 1/2/90 Intervention Br. at 5), and "because, without intervention, Bowie Kuhn will have to commence a separate adversary proceeding to seek the exact relief provided by the TRO." (*Id.* at 7).

15. The Court did not grant Kuhn's motion for permissive intervention as a party plaintiff. Kuhn has never moved to intervene as of right under Bankruptcy Rule 7024, or to intervene as a party defendant. Nor has Kuhn ever commenced a separate adversary proceeding seeking any relief, let alone relief similar to that provided by the TRO.[8]

16. A plan of reorganization (the "Plan") was filed by the so-called "Marcus Group" of Partners spearheaded by Marcus on April 23, 1990. After the Debtor joined its support to the Plan, a joint Disclosure Statement was filed with the Court and approved on July 26, 1990. On July 30, 1990, the Disclosure Statement and ballot for accepting or rejecting the Plan was mailed to the creditors. Although the Official Committee of Unsecured Creditors (the "Creditors' Committee") has been supportive of the idea of a consensual resolution of the claims of the creditors against the Debtor and the Partners, the present Plan does not have the support of the Creditors' Committee. It is the position of the Creditors' Committee that the level of proposed Partner contributions under the Plan is too low when compared to the aggregate net worths of the Partners as calculated by the Creditors' Committee. The Plan provides for the issuance of a permanent injunction against suits by creditors or other Partners against a contributing Partner. The concept of a permanent injunction has been a cornerstone of all proposals for a consensual plan.

17. Based on the early results of voting reported to the court on August 16, 1990, the Plan will not be accepted by the requisite one-half in number and two-thirds in amount of creditors. The landlord of M & K's former premises, who is the largest single creditor, has to date not accepted or rejected the Plan and is engaged in discussions with the Marcus Group about the prospects of an enhanced proposal that would be acceptable to it. The large creditors of M & K, including its lender, Marine Midland Bank, desire at this time to continue the efforts at achieving a confirmable plan as they believe that the alternative is the prospect of years of litigation with individual Partners with an uncertain ultimate recovery.

18. All creditors named in the adversary proceeding as well as the Creditors' Committee have allowed the TRO to continue with their actual or implied consent.[9]

---

**8.** The Court issued a preliminary injunction against Kuhn in the Partner Adversary Proceeding, No. 90–6039A (PBA), dated July 23, 1990 and entered July 26, 1990, and hereby expressly incorporates by reference the findings of fact and conclusions of law set forth in that Order in these Restated Findings of Fact and Conclusions of Law.

**9.** There have been hearings at which there were objections voiced to the continuation of the TRO, but the Creditors Committee and the named creditors have subsequently consented or acquiesced to the continuation of the TRO, and implicitly have ratified prior extensions. Neither the Creditors Committee nor any creditor has ever appealed the TRO.

19. Shearson, which originally objected to the TRO, and moved to vacate it, has since acquiesced, as shown by Shearson's presence on the Creditors' Committee, which has consented to the entry of the TRO, and by Shearson's failure to press its objections to or to appeal the TRO or its renewal. (2/13/90 Tr. 85; *see* TROs on consent entered after February 13, 1990.)

20. The Court accepts the testimony of Marcus that the prosecution of any lawsuits by the creditors against the Partners would have seriously interfered with the Partners' ability to bill and to collect work-in-process and accounts receivable, which the evidence shows are the Debtor's most valuable assets, aside from the proposed Partner contributions to the Plan. (2/13/90 Tr. 98–101)

21. The halt of prosecution of lawsuits by the creditors was and is necessary to support the Debtor's efforts to foster cooperation among the Partners in order to obtain the contributions from the Partners necessary to enable the Debtor to formulate a plan of reorganization. (12/28/89 Tr. 98; 1/3/90 Tr. 4, 9; 4/2/90 Tr. 25)

22. The purpose of the TRO has been solely to help enable the Debtor to develop a consensual plan of reorganization under which Partner contributions would be made for the benefit of creditors; any benefit the Partners receive from the TRO is strictly incidental. (1/3/90 Tr. 4; 1/9/90 Tr. 4; 2/13/90 Tr. 83–84)

23. The existence of the TRO has fostered the process of developing a consensual plan under which Partner contributions would be made. (4/23/90 Tr. 104, 107) In fact, the TRO has allowed the Debtor to advance as far as it already has in the plan process.

24. By virtue of the TRO, and Marine Midland Bank's voluntary agreement to refrain from litigation against Partners complying with the TRO for as long as the creditors are stayed, the creditors are assured that there will be an orderly process by which the assets of the Debtor are marshalled and contributions from Part-

ners made available to fund a Plan, and that they will not be harmed relative to each other by the TRO. (2/13/90 Tr. 133)

25. The TRO has the further advantage of identifying and maintaining the Partners' assets for a trustee to reach in the event that a plan cannot be confirmed and the case is converted to a Chapter 7 case. (3/22/90 Tr. 50; 4/19/90 Tr. 114) The information gathered from the Partners as a condition to inclusion under the TRO has been of significant value in the administration of this case. Both the Debtor and the Creditors' Committee have made use of the information in evaluating the Plan and a summary of the information was included in the approved Disclosure Statement. By obtaining the information as a condition of the TRO, both the Debtor and the Creditors' Committee were spared the necessity and expense of resorting to examinations under Bankruptcy Rule 2004 of the Partners. The information forms a baseline for each Partner which would be of value to a Chapter 7 trustee should this case be converted.

26. Denying the TRO would severely cripple the consensual plan process because the Partners would perceive such a denial to put them at great risk for enormous amounts of litigation and is likely to pressure at least some of them to file personal bankruptcy petitions. (1/3/90 Tr. 30) In the event that a Partner files a personal Chapter 7 or 11 petition, the Partner's future earnings, from which the plan contributions of a number of the Partners are expected to come, would not be available to pay creditor claims as such earnings would not become part of the bankruptcy estate because of the provisions of Bankruptcy Code § 541(a)(6) under which earnings from services performed by an individual debtor after the commencement of the case are not part of the bankruptcy estate. The prospective of multiple personal bankruptcy filings by the Partners is particularly severe in this case because 13 of the Partners, including name partner Myerson, are former partners of another insolvent law firm, Finley, Kumble et al.[10] Indeed, one

---

**10.** This court also presides over the Finley Kum- ble case, which is also a Chapter 11 case. A

of these "dual" partners, Herbert Bockstein ("Bockstein") filed a Chapter 7 petition in July 1990.

27. To maximize the TRO's benefits to the Debtor's plan process, the Court imposed several conditions on Partners who wished to retain the protection of the TRO, including (i) a financial commitment to contribute to the Debtor's plan, (ii) sworn financial disclosure statements setting forth the individual Partner's assets and liabilities, and (iii) the execution of an undertaking not to transfer assets in order to prevent fraudulent conveyances which would place assets beyond the reach of creditors who had consented to the TRO. (2/13/90 Tr. 77; e.g., 2/13/90 TRO; 3/2/90 TRO)

28. The Court has excluded any Partner from protection under the TRO whenever the Court became aware that there had been a failure to comply with any one of the foregoing conditions, and has included Partners who complied. At one time, eleven of the Partners were excluded from the TRO for failure to comply with one or another of these conditions. (1/23/90 Tr. 85) This use of the Court's discretion to include or exclude Partners as appropriate has increased the cooperation among the Partners and assisted the plan process. (2/13/90 Tr. 134; 4/2/90 Tr. 104) At present, three non-contributing Partners are not protected by the TRO, including Kuhn.

29. This Court's close monitoring of the TRO further ensures that the defendants will not be harmed by the TRO. (2/13/90 Tr. 134)

30. Kuhn has not complied with various of the conditions prerequisite to receiving protection under the TROs:

(i) Kuhn has never disclosed the required financial information; (3/7/90 Tr. 20)

(ii) Kuhn has never undertaken not to transfer assets (or not to make fraudulent conveyances), something that is particularly significant since Kuhn is known to have sold his house in New Jersey following the entry of the original TRO knowing of the pending litigation, despite representations to this Court by his counsel that he was not moving (2/13/90 Tr. 72); Kuhn issued a press release purporting to justify his move to Florida which has more liberal personal exemption laws than either New Jersey or New York as based on long-standing family ties; Kuhn removed his brokerage account from New York State; (2/13/90 Tr. 26); and

(iii) Kuhn is one of only three of the forty-four equity Partners [11] who has not made an unconditional commitment to the Debtor's Plan. (8/2/90 Tr. 24)

31. The testimony supports the conclusion that Kuhn's actions also have harmed the Debtor by distracting and raising the level of concern by the creditors and Partners, making it more difficult for the Debtor to obtain their cooperation in negotiating a Plan. (1/29/90 Tr. 94; 2/13/90 Tr. 98–101)

32. At this time, the granting of a TRO which would protect Kuhn without his compliance with the conditions in the TRO would create the impression that this Court was condoning his conduct in moving his assets to Florida in an apparent effort to shield those assets from creditor claims under the liberal Florida exemption laws, which conduct appears improper because it occurred after the commencement of this case at a time when Kuhn was within the protection of the TRO. The inclusion of Kuhn would be unfair to Partners who have properly complied with all conditions of the TRO. (2/13/90 Tr. 129)

33. No competent evidence has been presented to the Court that Kuhn has had

Chapter 11 trustee has been appointed in that case. The Finley estate is a major creditor in this case. The Finley trustee has been seeking to fund a plan of reorganization in that case from partner contributions with the active support of the creditors' committee. At the August 16 hearing in this matter, counsel for the Finley trustee advised that it is expected that the trustee will be able to move towards confirmation in that case as monetary terms have been agreed upon with the final group of key partners.

11. Philip Heller ("Heller") and Julius Steiner ("Steiner") also currently are excluded from protection, not having committed to make a contribution.

to pay any money to any M & K creditors or has had any judgment rendered against him relative to a M & K claim. (7/2/90 Tr. 193; Order dated 7/23/90, Finding of Fact ¶ 8)

### Conclusions of Law

1. The Court has jurisdiction of the subject matter and the parties to this adversary proceeding. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. There are two different issues to be addressed in these proceedings. First, whether the Debtor has demonstrated that the Court should have entered and continued a temporary restraining order protecting certain Partners from certain creditors' claims. Second, whether the Debtor has demonstrated that it is reasonable to limit protection of the TRO to those Partners who have complied with it. The first question is logically prior and will be addressed first.

3. The standard in the Second Circuit for obtaining injunctive relief is "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Company of New York*, 749 F.2d 124, 125 (2d Cir.1984), *citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

4. These orders were temporary restraining orders entered pursuant to (i) Bankruptcy Rule 7065 and (ii) Section 105 of the Bankruptcy Code. Nearly all TROs following the February 13, 1990 TRO also may be construed to be consent decrees, having been entered, extended and modified on motion or consent of the Official Committee of Unsecured Creditors and Debtor, and the consent, acquiescence or ratification of all parties to the adversary proceeding. (*E.g.*, 4/2/90 Tr. 25)

■ 5. These orders are TROs, not preliminary injunctions, because they were in effect for limited durations of time (approximately ten days). The Court deliberately designated the TRO as such rather than as a preliminary injunction for two principal reasons. First, this generally was the agreement of the parties to the proceeding. Second, so that, at the cost of the significant judicial time and effort, revisiting the topic every ten days or so, the Court could ensure that the parties were progressing toward a liquidating plan of reorganization for the Debtor. The Court finds that this procedure has protected the interests of the parties, and especially the creditors. (2/13/90 Tr. 134)

■ 6. While FRCP 65(b) applicable by virtue of Bankruptcy Rule 7065 provides that, as a general rule, a TRO may be extended solely for a ten day period, the Rule contains the exception "unless the party against whom the order is directed consents that it may be extended for a longer period." It is well-established that TROs may be extended on consent under the express terms of the Rule beyond ten or twenty days. *Grant v. United States*, 282 F.2d 165, 168 (2d Cir.1960); *Haitian Refugee Center v. Civiletti*, 614 F.2d 92, 93 (5th Cir.1980), *cited with approval in Fernandez–Roque v. Smith*, 671 F.2d 426, 430 (11th Cir.1982).[12]

■ 7. To the extent that the TROs were entered on consent, they also could be considered contractual in nature, and enforced on that basis. *See Berger v. Heckler*, 771 F.2d 1556, 1567–68 (2d Cir.1985).

8. Section 105 of the Bankruptcy Code grants the Court broad equitable power to "issue any order, process or judgment that is necessary or appropriate" to advance the

---

**12.** If for some reason this interpretation of FRCP 65(b) is incorrect, or acquiescence or implied consent cannot be taken to be "consent" for purposes of FRCP 65(b), the Court would have entered a preliminary injunction, given the overwhelming need in this case for injunctive relief to allow for negotiation of a plan of reorganization and to maximize the assets to be distributed to creditors. In the Finley Kumble Chapter 11 case this court has granted and continued for over two years a preliminary injunction which is similar in scope to the TRO entered here to enable the trustee to obtain partner commitments to fund a plan.

bankruptcy proceedings and matters related to the proceeding. *In re Old Orchard Investment Co.*, 31 B.R. 599, 601 (W.D. Mich.1983); *MacArthur Co.'v. Johns–Manville Corp.*, 837 F.2d 89 (2d Cir.1988) (permanent injunction may be issued against actions against an insurer as part of settlement incorporated in a Chapter 11 plan notwithstanding claim that this impermissibly discharged a non-debtor); *In re A.H. Robbins Co.*, 880 F.2d 694, 702 (4th Cir. 1989) (affirming power of bankruptcy court to enjoin suits against non-debtors, where there existed certain indemnification rights against the debtor) (collecting cases); *In re AOV Industries, Inc.*, 792 F.2d 1140, 1152 (D.C.Cir.1986); *In re Comark*, 53 B.R. 945 (Bankr., C.D.Cal.1985) (judgment creditor enjoined from enforcing claims against debtor's individual partners). (1/9/90 Tr. 16)

9. Section 105 grants bankruptcy courts "ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process, whether in a liquidation or in a reorganization case." *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr., S.D.N.Y.1983), *quoting Collier on Bankruptcy* ¶¶ 362.05 (15th ed. 1982). Further, bankruptcy courts "may issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the debtor's ability to formulate a Chapter 11 plan." *In re Johns–Manville Corp.*, 40 B.R. 219, 226 (S.D.N.Y.1984). (1/9/90 Tr. 16)

■ 10. The M & K case presents the need for the bankruptcy court to make a careful balance between (a) the preservation of the individual rights of creditors against the Partners and (b) the collective goal of maximum recovery for all creditors in a reasonable period of time. There would have been irreparable harm had the Court not granted the original TRO in December 1989 because there was then a pressing burden on the Partners to defend against lawsuits that had or were likely to have been brought against them by creditors and/or clients, because of Partners' alleged liability on claims against Debtor. The Partners' defense of those actions would have led to the early litigation of the intra-Partner disputes over liability to M & K creditors. The Debtor would then have been forced to litigate its right to contribution from the Partners in order to preserve all of its rights under the M & K partnership agreement and state and bankruptcy law. There was and is no urgency to immediate litigation of the complex intra-partner disputes created by the timing of various Partner withdrawals and the assertions of actual misconduct with respect to at least one Partner. That litigation will never be necessary if a consensual plan or other compromise and settlement between and among the creditors and the Partners can be effected in this case. The creditor claims pending on the Petition Date included an action by an employment agency for past-due compensation, an action on the Brunswick claim for legal malpractice, an action on the Shearson note and an action for an amount due and owing on goods or services sold and delivered. There was a strong likelihood that new lawsuits would have been filed against the Partners by other creditors of Debtor because of Debtor's Chapter 11 filing. (*See generally* 12/28/89 Tr. 98; 1/3/90 Tr. 4, 9, 30; 4/2/90 Tr. 25) The size and nature of some of the claims, e.g., the breach of lease claim of the landlord, the Brunswick malpractice claim and the Shearson note, are such that the creditors have a sufficient interest and motivation to pursue their claims against the Partners.

11. Failure to enjoin these lawsuits would have significantly interfered with and irreparably harmed Debtor's ability to formulate a plan of reorganization, and would have resulted in diminishing Debtor's assets, because of the likely limited Partner cooperation in administration of the estate, billing work-in-process, determining, billing and collecting accounts receivable, and, most importantly, formulating and contributing to a voluntary plan of reorganization. Further, injunctive relief was needed to effectuate fully the main purposes of the automatic stay envisioned by the Bankruptcy Code: i.e., avoiding the dismemberment of Debtor's estate, and the prevention of a multiplicity of litigation

between and among creditors, Partners and Debtor, including direct claims and claims among Partners for contribution or indemnity, that would have drained the estate of assets. Absent a stay, the estate, its assets (including its legal malpractice insurance policy under which Debtor is responsible for a $750,000 deductible, and legal fees up to that amount), and its Partners' assets would have been severely diminished, thereby resulting in an inefficient and inequitable administration of the estate's assets, and a diminished return to creditors, directly contrary to the intent of the Bankruptcy Code. (*See generally* 12/28/89 Tr. 98; 1/3/90 Tr. 4, 9, 30; 4/2/90 Tr. 25)

12. The evidence adduced also showed irreparable harm because the commencement, prosecution or continuation of litigation against Partners willing to contribute to a consensual plan of reorganization would have been unsettling and substantially inhibited progress toward prompt negotiation and confirmation of a plan. Absent injunctive relief, Partners' willingness to contribute voluntarily toward a plan and the Debtor's capacity to marshal assets necessary for its liquidating Plan of reorganization would have been at best severely diminished.

13. Since entry of the TRO, substantial progress has been made toward the possibility of the confirmation of a consensual plan of reorganization. The Debtor and the Marcus Group of Partners have proposed plans of reorganization, pursuant to which all Partners, except Kuhn, Heller and Steiner, have agreed to contribute in excess of $4.1 million [13] over time to pay off creditors. Further, a disclosure statement was approved by order of this Court dated July 26, 1990 and the creditors were sent ballots to vote on the Plan on July 30, 1990.

14. There would have been irreparable harm to the estate and Debtor's and creditors' efforts to negotiate a confirmable plan of reorganization had not the TRO

been continued every ten days or so since the original TRO was entered on December 28, 1989. (*E.g.*, 12/28/89 Tr. 70; 1/3/90 Tr. 30) The Court specifically draws the implication from the evidence, and the fact that the February 13, 1990 TRO was entered at the instance of the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and that subsequent continuations of the TRO have been with the express or implied consent of all the named defendant creditors and the Creditors' Committee, that absent the TRO, there would be irreparable harm to the estate, and irreparable loss in the value of Debtor's estate available to be distributed to creditors.

15. In short, the Court holds that absent a TRO there would have been irreparable harm from (1) a multiplicity of actions by creditors against Partners and resulting litigation among the Partners which litigation would be a burden to the judicial system, costly to the estate, Partners and creditors because of the time an attorneys' fees required and create the prospect of inconsistent adjudications without conferring any benefit remotely commensurate with the expense in time and money; (2) a disorderly and inequitable distribution of assets to creditors, contrary to the contemplation of the Bankruptcy Code; (3) substantial disruption to the Partners' efforts to devise a Plan that would fund a substantial part of the deficiency owed to creditors out of the Partners' personal assets, and (4) a significantly increased risk of multiple personal bankruptcy filings.

16. Debtor also has shown likelihood of success on the merits, or at the very least the existence of serious questions going to the merits and balance of hardships. (7/2/90 Tr. 197) There is authority that this prong of the test for injunctive relief can be met in the early stages of a bankruptcy by virtue of the debtor's right to present a plan to the creditors for their consideration. *In re Otero Mills, Inc.*, 21 B.R. 777, 779 (Bankr., D.N.M.1982), *aff'd*, 25 B.R. 1018

---

13. This figure excludes Herbert Bockstein's (who has since filed for bankruptcy) Kuhn's, Heller's and Steiner's proposed contributions.

(D.N.M.1982). There existed from the outset of this case reasonable prospects that a plan of reorganization under which Partners would make contributions would be proposed.

17. This court does not interpret this prong as requiring it to find that there is a likelihood that a particular plan will be successfully confirmed. Rather, this court views the success issue as going to whether the broad structure of the Plan, including the requirement of the issuance of a permanent injunction in favor of contributing Partners, is legally feasible; whether reasonable efforts to propose and implement a plan are ongoing; and what would be the legal effect of converting this case to Chapter 7, which would be the ultimate result if no plan could be confirmed. On the last point, it is necessary to take account that in a Chapter 7 case involving a partnership, Section 723 of the Bankruptcy Code [14] is applicable. Because of the provisions of Code § 723, a Chapter 7 trustee would be entitled to request, and would be likely to request, relief in the form of an injunction or otherwise (see Bankruptcy Code § 723(b) under which the Trustee may seek an indemnity from a general partner for the deficiency) to protect the estate for much the same reasons Debtor has sought this injunctive relief, including the need not to compete with creditors and Partners for assets of the Partners necessary to pay the creditors' claims. This court has previously found that reasonable efforts at implementing a plan are ongoing. As to the legal feasibility of the issuance of a permanent injunction this court finds there is a least a serious question going to the merits and a balance of hardships in the Debtor's favor. As set forth in Paragraph 13 of the Findings of Fact, Kuhn himself initially argued that a § 105 injunction was legally possible. He now states that his earlier position was based on his erroneous reliance on Debtor's counsel's representations that a § 105 injunction was within the court's power. However, Kuhn's counsel has repeatedly taken the position that Kuhn will contribute to a "consensual" plan that has the consent of all creditors and pursuant to which the Partners would be absolved of any further responsibility to M & K creditors, a position inconsistent with his argument that no § 105 injunction is possible. With a creditor body the size of the one in this case, no plan predicated on the voluntary consent of *all* creditors is realistic.

18. The major argument that can be made against the concept of the issuance of a permanent injunction under a plan calling for contributions by partners is that Bankruptcy Code § 524(e) expressly provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The Ninth Circuit recently affirmed the denial of permanent injunction in *In re American Hardwoods, Inc. (American Hardwoods, Inc. v. Deutsche Credit Corporation)*, 885 F.2d 621 (9th Cir.1989) on the basis of Code § 524(e). Compare *Credit Alliance Corporation v. Williams*, 851 F.2d 119 (4th Cir. 1988) in which the 4th Circuit distinguished its earlier decision in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93

---

**14.** This section does not apply in a Chapter 11 case. Under subsection (a) of Code § 723, the trustee of the partnership has a claim against each general partner for the full amount of any deficiency of property of the estate to pay allowed claims in full.

Subsection (b) of Code § 723 directs the partnership trustee to first proceed against any partners who are not debtors for the deficiency and further provides that pending "determination of such deficiency, the court may order any such partner to provide the estate with indemnity for, or assurance of payment of, any deficiency recoverable from such partner, or not to dispose of property."

Under subsection (c), it is provided that the partnership trustee may file a claim for the full amount of all allowed claims against the estate of any debtor partner.

Finally, subsection (d) provides that if there should be a surplus collected by the partnership trustee, the court shall determine an equitable distribution of the surplus to the general partners.

For a discussion of the operation and effect of Code § 723, see 4 *Collier on Bankruptcy* (15th Ed.1990) Par. 723.01–.05 at 723–2 et seq.

L.Ed.2d 177 (1986). The injunction denied in *American Hardwoods* would have enjoined a suit against the two shareholder guarantors on a machinery loan on confirmation of the debtor's plan. Although the debtor argued that the pursuit of the guarantors would irreparably injure the debtor's efforts to confirm and administer a reorganization plan, the opinion does not indicate that the guarantors proposed to contribute any monies under the plan and it is apparent that their stock interest in the debtor is one of the guarantors' assets that would have been protected by the injunction. This court does not find that *American Hardwoods* in which a non-contributory permanent injunction was sought is pursuasive authority that no permanent injunction could issue on the facts of this case.

19. In *In re Finley, Kumble, Wagner, Heiner, Underberg, Manley, Myerson & Casey,* 85 B.R. 13 (Bankr.S.D.N.Y.1988), this court suggested that a permanent injunction would be possible on the basis of the Second Circuit's decision in *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89 (1988) which approved a permanent injunction against an argument that it was violative of Code § 524(e) on a fact pattern in which, *inter alia,* the insurance carriers who would benefit from the injunction were making a fund available to pay insured claims. See 85 B.R. at 17 at Footnote 7. The court's suggestion was made at a time when it seemed possible in the Finley Kumble case that creditors could be paid in full, perhaps without interest, as a result of partner contributions. Payment in full in the Finley Kumble case is now plainly not feasible based on the size of the deficiency and the net worths of the partners. The plan that has been proposed in this case does not contemplate payment in full of creditor claims. The issue thus becomes whether anything less than payment in full could justify a permanent injunction. If the Partners are paying, based on their net worths and an assessment of any available defenses, the most that creditors could obtain from them, then there is a likelihood of success on the merits, or at a minimum sufficiently serious questions going to the merits to make them a fair ground for litigation, that a permanent injunction could issue, at least when confirmation of the plan is desired by the creditors' committee and has been duly accepted by creditors, in reliance on such cases as the 2nd Circuit's decision in *MacArthur* and the 4th Circuit's decision in *A.H. Robins,* 880 F.2d 694, cited *supra.* How much less than a "best efforts" plan might suffice need not be decided at this stage in the litigation.

20. The balance of hardships tips decidedly in the Debtor's favor as against the delay suffered by individual creditors who might otherwise proceed to litigate against Partners and collect from Partner assets. Failure to enjoin litigation by creditors against contributing Partners on debts and obligations owed by Debtor would unsettle efforts to achieve a consensual Chapter 11 plan to pay all creditors and diminish the assets available to all creditors should the case be converted to Chapter 7. The TRO has prevented certain creditors from gaining an advantage that would have prevented an organized and equitable distribution of Debtor's assets. Failure to prevent or extend the TROs would have significantly diminished the total assets of the estate ultimately available to be distributed to creditors.

21. Turning from the issue of the propriety of having entered and extended the requested TRO, there is the second issue of the propriety of not having extended protection under the TRO to all of the Partners. There are at least four reasons why this occurred. First, and fundamentally, as the Court repeatedly has held, this order "is not for the purpose of providing breathing room to non-debtors." (1/23/90 Tr. 9) Rather, the TRO was issued to help enable the Debtor to accomplish a consensual plan of reorganization and to preserve assets available to estate. (1/3/90 Tr. 4; 1/9/90 Tr. 46, 48; 2/13/90 Tr. 67, 82–83; 4/2/90 Tr. 25)

22. Second, and relatedly, Kuhn and any of the other Partners who were at various times not included within the protection of the TRO were not parties to the adversary proceeding and accordingly

lacked standing either (i) to seek or apply for broader relief under Section 105, or (ii) seek or apply to terminate the relief that had been ordered as to the creditors vis-a-vis Partners incidentally protected by the TRO. (8/2/90 Tr. 22–23, 34)

23. Third, all parties to the proceeding sought to have any Partner excluded from protection of the TRO who failed to comply with one or more conditions precedent to protection set forth in the TRO, or for conduct that disqualified them from equitable relief.

24. Fourth, the TROs were consented to or ratified by the Debtor and the creditors, and may well be enforceable as a contract, as well as an order of the Court.

 25. As a Partner, Kuhn is an interested party in the bankruptcy case itself. He is not, however, a party to this adversary proceeding. Bankruptcy Code § 1109(b) on which Kuhn relies for his absolute right to be heard in this adversary proceeding provides that a "party in interest" may raise and may appear and be heard on any issue "in a case under this chapter." As this Court held in *In re Neuman*, 103 B.R. 491, 496–98 (Bankr., S.D.N.Y.1989) (on appeal), the word "case" in Bankruptcy Code § 1109(b) refers only to the case proper and does not extend a right to intervene in adversary proceedings. One must be a party to an adversary proceeding to participate or seek relief therein. The Court incorporates by reference here its analysis in *Neuman* of Code § 1109. This court believes that its interpretation of Code § 1109 set forth in *Neuman* is in accord and harmony with the statutory scheme of the Bankruptcy Code.

 26. Here, all parties, the Debtor and the creditors, were in agreement that Kuhn should be excluded from the TRO and failure to do so would have undercut the chances for a consensual plan. (2/13/90 Tr. 13–14, 63, 74; *see* 3/2/90 and subsequent TROs). The Court agrees with this conclusion for the reasons set forth below.

27. Kuhn is not entitled to a stay of creditor litigation that may be causing him expense, unless requested by and for the benefit of the Debtor. (1/9/90 Tr. 46) If Kuhn cannot meet his obligations to his creditors, he can file for bankruptcy and thereby obtain the benefits of the automatic stay under Section 362 of the Code. (1/9/90 Tr. 47–48) Kuhn's interest as a non-debtor in not paying his creditors is not an interest cognizable under the Bankruptcy Code.

28. Further, Kuhn has never moved to intervene as a defendant in the proceeding. Kuhn's counsel only indicated his intent to act as a party defendant, without intervening, after the Court stated at the February 13 hearing that it would not extend the TRO to protect Kuhn. Kuhn's counsel argued that creditors should be free to sue all of the Partners, thereby attempting to align himself with the defendant creditors. In so arguing, Kuhn was seeking to assert the rights of others—the creditors who were restrained. As the Court held at that time, Kuhn lacks "standing to complain about the 105 injunction as to others than himself." (2/13/90 Tr. 132)

29. The Court has repeatedly held, and repeats here, that:

> "I have made rather clear from the very beginning that the harm or prejudice to the individual partners is not that much of my concern. My concern is with the prejudice or harm to the estate's efforts to formulate a plan of reorganization for which there may be an incidental benefit to the partners." (2/13/90 Tr. 83)

30. In any event, Kuhn's own conduct disqualified him from the protection of the TRO. Kuhn's conduct to date has not been equitable, and he is not entitled to equitable relief. (3/7/90 Tr. 18)

31. Knowing of the pendency of litigation against him, Kuhn sold his house in New Jersey for $1.2 million (2/13/90 Tr. 72), removed assets from New York, became unlocatable for the service of process, and purchased a new home in Florida and apparently an annuity (2/12/90 Tr. 26), with the intent to defeat creditors. The

transfers may be fraudulent transfers.[15]

32. Even if the transfers were not fraudulent, however, it is clear in hindsight that Kuhn's counsel evaded questions from the Court at the January 3, 1990 hearing after the Court specifically noted that it would consider excluding Kuhn from protection of the TRO at that time if Kuhn were to be leaving the jurisdiction. (1/3/90 Tr. 48) Kuhn's counsel represented to the Court and creditors at that time that "Mr. Kuhn is not fleeing to any foreign jurisdiction or anything else or playing any games." (1/3/90 Tr. 49) In reliance on this representation, Marine Midland Bank, among other creditors, forbore from pressing its claims against Kuhn, and did not seek to attach Kuhn's house. Other creditors similarly desisted, and the Court maintained Kuhn within the protection of the TRO at that time. Kuhn's dissembling with this court was not appropriate behavior, and in and of itself justified Debtor's decision not to seek to continue to include Kuhn within the TRO. (2/13/90 Tr. 94, 131)

33. The Court held, and reiterates that Kuhn's conduct justified Debtor's decision not to seek to continue to include Kuhn within the § 105 order. (2/13/90 Tr. 94, 131) Certainly, Debtor's efforts both to convince Partners voluntarily to contribute to a plan of reorganization, and to convince creditors to accept such a plan required trust and the appearance and evidence of good faith. Kuhn's conduct, while perhaps legal, has been destructive of the atmosphere of trust and good faith needed to negotiate a consensual plan providing for Partner contributions. (7/12/90 Tr. 73–74, 3/7/90 Tr. 18)

34. In addition to Kuhn's other conduct, the Court also excluded Kuhn from protection under the TRO for Kuhn's failure to comply with conditions precedent to protection, each and every one of which would have or has resulted in exclusion of Kuhn and any other Partner from the order's incidental protection.

35. Kuhn failed to consent to contribute the amount set forth in the Debtor's plan, and never unequivocally offered to contribute to the Plan without imposing additional conditions. The Debtor had no duty to seek to include Kuhn in the TRO as it was the Debtor's best judgment, concurred in by the Creditors' Committee, and all or substantially all of the other Partners, that to do so would impair Debtor's prospects of achieving a consensual plan of reorganization.

36. The Court also finds that refusal of Kuhn, a name partner of Debtor, to make voluntary contributions at a level commensurate with his net worth, would impair the prospects of achieving a consensual plan of reorganization, especially where Debtor's plan is dependent on the Partners' contributions. (1/3/90 Tr. 6) It is appropriate for Debtor not to seek Kuhn's (or other non-contributing Partners') inclusion in the TRO where the orderly implementation of its liquidating plan is dependent on Partner contributions as set forth in its plan. *See, e.g., Mahaffey v. E–C–P of Arizona, Inc.,* 40 B.R. 469 (Bankr.D.Colo. 1984) (denying injunctive relief where no evidence was presented that non-debtor had contributed or was to contribute to debtor partnership reorganization).

37. Moreover, Kuhn also is not entitled to any relief because he still has never made the financial disclosures required under the TROs, and accordingly the Court finds Kuhn's counsel's repeated claims that

15. *See In re Gefen,* 35 B.R. 368, 372 (S.D.Fla. 1984) (debtor's pre-bankruptcy purchase of a deferred annuity with non-exempt funds when the debtor was aware of pending litigation held a fraudulent transfer); *In re Strehlow,* 84 B.R. 241, 245 (S.D.Fla.1988) (debtor's conversion of non-exempt to exempt property when already insolvent held a fraudulent transfer avoidable by the trustee under Florida law); *Ford v. Poston,* 773 F.2d 52, 55 (4th Cir.1985) (discharge denied because debtor transferred real property to himself and his wife intending to defraud creditors); *In Re Reed,* 700 F.2d 986, 991 (5th Cir.1983) (debtor denied discharge because of conversion of non-exempt to exempt assets with intent to defraud creditors); *Petretti v. Finnigan,* 68 Misc.2d 1007, 1008–09, 328 N.Y.S.2d 705, 708 (S.Ct.Nassau County 1972) (conveyance of property made while party was a defendant in an action for money damages held fraudulent as to judgment creditor).

Kuhn is being asked to contribute a disproportionate amount to the Plan to be noncredible. The financial disclosure is important to allow the Court, Debtor, and the creditors to judge whether the level of contributions sought from the various Partners, including Kuhn, under Debtor's plan are appropriate, and to prevent fraudulent conveyances of property, all in aid of formulating, evaluating or confirming a plan of reorganization. In the case of Kuhn, who has not dealt in a straightforward manner with the Court, such disclosure is especially important. As the Court held on March 7, 1990:

"I am not prepared to extend the 105 injunction to Kuhn, even if somebody asked me, without Kuhn making prior disclosure. I think that in his case his conduct would support to me that we should have disclosure first.... I don't have any reason to believe that I necessarily could count on the disclosure coming if the 105 injunction were to cover him." (3/7/90 Tr. 20)

To date, Kuhn has not submitted the required financial disclosure. Kuhn's claim that the waiver provision condition in the TRO is inappropriate presupposes that he would choose to file a personal bankruptcy petition, something which to date he has given no indication of doing. Given Kuhn's highly public conduct in transferring non-exempt assets to exempt assets during the course of this case, it was and is imperative to the integrity of this case to condition the TRO on a covered Partner's agreement not to engage in similar conduct. Kuhn's conduct created a high risk that other Partners would take a what-is-sauce-for-the-goose-is-sauce-for-the-gander approach to the conduct of their personal affairs. That would have been detrimental to efforts to achieve either a consensual plan or a swift resolution of this case in the event of a conversion to Chapter 7.

38. The Court also holds that there has been no effort to focus litigation aimed at the other Partners at Kuhn by introducing conditions into the TRO solely for the purpose of making those conditions unpalatable to Kuhn. The Debtor and creditors have, if anything, been overly eager to attempt to accommodate Kuhn, and to give him special treatment despite his failure to comply with many of the conditions precedent to relief. The Court repeatedly has refused to permit any special deal for Kuhn (*see, e.g.,* 1/29/90 Tr. 94; 2/13/90 Tr. 26; 3/7/90 Tr. 20), and repeats that decision here. The fact that Kuhn's immediate prepetition and post-petition conduct makes him unwilling to agree to the TRO conditions does not render those conditions inappropriate, particularly since any objective assessment of the TRO conditions indicates they are appropriate and they are not unduly draconian as evidenced by the widespread agreement of other Partners to them.

39. All evidence adduced shows that granting the injunctive relief requested, and the exclusion from such relief of Partners who did not comply with the various conditions precedent for such relief, was in the best interests of Debtor, the estate, and creditors, and has promoted the orderly administration of this estate.