### In re BOSTON HARBOR MARINA COMPANY, Debtor.

#### Bankruptcy No. 92–42080–JFQ.

United States Bankruptcy Court, D. Massachusetts.

Aug. 3, 1993.

---

728

Howard J. Levitan, Choate, Hall & Stewart, Boston, MA, for Boston Harbor Marina Co.

Edward J. Mulligan, Abington, MA, for Edward J. Mulligan.

Edward Woll, Jr., John J. Cheney, Sullivan & Worcester, Boston, MA, for Marina Industries, Inc.

Robert J. Kerwin, Hinckley, Allen & Snyder, Boston, MA, for City of Quincy, MA.

Richard Rodgers, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for Dr. Wallace R. Merles.

Andrew L. Cohen, Goodwin, Proctor & Hoar, Boston, MA, for Prudential Ins. Co. of America.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Boston Harbor Marina Company (the "Debtor") requests confirmation of its First Amended and Restated Plan of Reorganization (the "Plan"). Various parties have lodged objections to confirmation, asserting the Plan improperly discharges parties other than the Debtor, fails to treat postpetition real estate taxes as administrative expenses, improperly designates claims as unimpaired and improperly classifies claims. I sustain the objections concerning discharge of nondebtor parties and classification of claims. I overrule the others.

The Debtor is a joint venture formed in 1982 to acquire and develop land in Quincy, Massachusetts now known as "Marina Bay." The initial joint venturers and their percentage ownership interests were as follows: Forge Development Corporation ("Forge")—25%, O'Connell Development Corporation ("O'Connell")—25%, and Marina Industries, Inc. ("Marina")—50%. Forge was a subsidiary of Monarch Capital Corporation ("Monarch Capital"), whose principal subsidiary was then Monarch Life Insurance Company ("Monarch Life"). Monarch Capital's various real estate investments led to its own chapter 11 proceeding in this court, which culminated in a confirmed plan.

The project was initially successful, but the Debtor's fortunes declined with the real estate depression which beset Massachusetts in the late 1980's and continues to today. The Debtor completed construction of a residential town-house condominium complex, two residential high-rise condominium buildings, a commercial and retail complex, an office building and a marina. After the project ran into trouble, Monarch Capital increased its stake in several ways. It caused its subsidiary, Monarch Life, to purchase two large mortgage loans and thereafter grant more favorable terms on them. It also caused Forge to purchase the 25% ownership interest of O'Connell for an undisclosed consideration, and a subsidiary of Forge, Forge–Quincy Development Corporation ("Forge–Quincy"), to purchase the 50% ownership interest of Marina for $1 million. There is apparently some dispute over whether the latter purchase included the acquisition of loan indebtedness which the Debtor owes Marina.

The chapter 11 trustee of Monarch Capital has entered into a settlement agreement with Monarch Life under which Monarch Life gives Monarch Capital's bankruptcy estate a percentage interest in any surplus foreclosure proceeds recovered by Monarch Life from its collateral. The settlement agreement also gives Monarch Capital's bankruptcy estate the entire interest in Monarch Life's deficiency claims and other unsecured indebtedness owed it by the

Debtor. Sovereign Realty Corporation ("Sovereign"), the successor to Monarch Capital's chapter 11 trustee, has in turn agreed with the Debtor and the unsecured creditors' committee in this case to donate to the Debtor's estate any of the surplus proceeds from foreclosure on the Debtor's mortgages, and to limit its recovery on its unsecured claims against the estate to one-third of the distributions on all the unsecured claims.

The Plan proposes the transfer of substantially all the Debtor's property to the various holders of secured claims in partial or total satisfaction of their debts. It establishes a trust whose trustees will conduct an orderly liquidation of the Debtor's remaining property and make payments to unsecured creditors. Except as otherwise provided in stipulations with Sovereign and a few other large unsecured creditors, each unsecured creditor is to share pro rata according to the ratio which its allowed claim bears to the total of all allowed unsecured claims.

## I. RELEASE OF NONDEBTOR PARTIES

The Plan proposes a discharge of not just the Debtor's indebtedness. The Plan would also discharge the liability on the project of the Debtor's co-venturers, Forge and Forge–Quincy, as well as the liability of O'Connell, whose 25% ownership interest Forge purchased. In addition, confirmation would discharge any liability of Monarch Life related to the project.

Section 8.2 of the Plan proposes to discharge the debts of these parties in two ways, through a release of their indebtedness and through a permanent injunction against action on the indebtedness. The Plan's provision on the permanent injunction states in part:

*Permanent Injunction and Releases.* In consideration of the consent of [Forge, Forge–Quincy and O'Connell] to the subordination of the [Forge, Forge–Quincy and O'Connell] claims pursuant to § 4.10 of the Plan and the agreement set forth in § 8.3 of the Plan, confirmation of this Plan shall operate as a permanent injunction pursuant to § 105 of the Bankruptcy Code barring the commencement of, or continuation of, any action or proceeding or prosecution against (a) [Forge, Forge–Quincy and O'Connell] of claims for which [Forge, Forge–Quincy, or O'Connell], or any of them would otherwise be liable (1) as co-venturers or partners of [the Debtor] or (2) arising out of any act or omission of [Forge, Forge–Quincy, or O'Connell] or any of them, including, without limitation, the execution of any contract, instrument or document, in connection with the acquisition of an interest in [the Debtor] or the business, financial affairs or operations of [the Debtor] occurring at any time either before or after the date of the formation of [the Debtor] as a joint venture, or (b) against [Monarch Life] of claims arising out of any act or omission of [Monarch Life] in connection with the business, financial affairs or operations of [the Debtor, Forge, or Forge–Quincy].

The Plan's provision effecting a release of the indebtedness states: "[C]onfirmation of this Plan shall operate as a release of any claims, obligations or liabilities of any kind [of Monarch Life, Forge, Forge–Quincy or O'Connell] relating to the project." The Plan goes on to say any holder of a claim against the Debtor "who votes to accept this Plan or whose class of claims votes to accept this Plan ... by acceptance of the Plan ... shall be deemed to have released each of [Forge, Forge–Quincy, O'Connell and Monarch Life] in accordance with the foregoing release provisions, and shall be forever deemed to be subject to the permanent injunction set forth above."

Prudential Insurance Company of America ("Prudential"), Marina and others object to these provisions. The Debtor justifies them by the consideration furnished by and on behalf of Forge and Forge–Quincy under the Plan. The asserted consideration takes several forms.

Forge and Forge–Quincy hold unsecured claims in "substantial amounts" for loans made and expenses incurred in development of the project. As consideration for the release and injunction, the Plan pro-

vides for subordination of these claims to all other unsecured claims. The Plan also subordinates O'Connell's claims, most of which Forge contends it owns by reason of its purchase of O'Connell's 25% ownership interest.

As further consideration for the release of Forge and Forge–Quincy, Sovereign as their "indirect parent company" agrees to limit its share of the distributions to unsecured creditors to one-third of the sums available for distribution. Sovereign also agrees to pay to the Plan's liquidating trustees whatever sums may be due Sovereign from Monarch Life under the agreement with Monarch Life which gives Sovereign a percentage interest in any surplus proceeds recovered from Monarch Life's foreclosures upon its mortgages. Sovereign makes these contributions on behalf of Forge and Forge–Quincy.

### A. *The Statutory Bar to Release of Nondebtors*

The Plan's provisions on the releases and injunction create insurmountable obstacles to confirmation. By statute, confirmation of a plan "discharges the debtor." 11 U.S.C. § 1141(d)(1)(A) (1988). Any conceivable ambiguity in the statute is removed by the further command that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e) (1988). Courts have accordingly denied effect to plan provisions seeking to release nondebtor parties or seeking to accomplish the practical equivalent by enjoining action against them. *E.g. Landsing Diversified Properties–II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592 (10th Cir.1990) modified by *Abel v. West*, 932 F.2d 898 (10th Cir.1991); *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621 (9th Cir.1989); *Underhill v. Royal*, 769 F.2d 1426 (9th Cir.1985); *Seaport Automotive Warehouse, Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610 (9th

Cir. BAP 1990); *Mellon Bank v. M.K. Siegel*, 96 B.R. 505 (E.D.Pa.1989).

### B. *Release of Nondebtor Insurer's Liability for Mass Tort Claims*

■ The statutory prohibition against discharge of third parties may nevertheless not apply in certain circumstances. The discharge of mass tort claims is one such circumstance. The Second Circuit, for example, has approved entry of a permanent "channeling" injunction enjoining action against liability insurers in a mass tort case because the insurers were contributing to a trust fund established to pay all tort claimants in full. *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 94 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *see also Menard–Sanford v. Mabey (In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).

### C. *Application of Res Judicata*

■ The doctrine of *res judicata* can bar later attacks on confirmation of a plan discharging nondebtor parties if the party seeking to set the confirmation aside had adequate notice in the bankruptcy proceeding. *E.g., Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987). One court has misused *Republic Supply* by relying upon it to approve the discharge of nondebtor parties even though timely objection was made to the discharge. *See Menard–Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). Apparently recognizing the timeliness of the objection made to confirmation here, the Debtor cites *Republic Supply* but makes no argument grounded upon *res judicata*.

### D. *Release Under Principles of Contract Law*

■ Principles of contract law can also permit the release of nondebtor parties, provided there is consideration for the release and its effect is limited to creditors who accept the plan provision containing

the release. Typically, the parties released provide additional funding for the plan. *See, e.g., In re AOV Indus., Inc.,* 31 B.R. 1005, 1010–11 (D.D.C.1983) *aff'd in part,* 792 F.2d 1140 (D.C.Cir.1986); *In re Resorts International, Inc.,* 145 B.R. 412 (Bankr. D.N.J.1990); *In re Monroe Well Service, Inc.,* 80 B.R. 324 (Bankr.E.D.Pa.1987). The more troublesome issue presented in these cases is whether the required equality of treatment within a class is lacking due to some creditors releasing claims which are more valuable than those held by others.

The Plan in the present case seeks to do much more than work a contractual release by consenting creditors. It would make class acceptance binding upon those who reject the Plan and those who fail to vote at all. Confirmation would bring about a permanent injunction "barring the commencement of, or continuation of, any action or proceeding or prosecution" against Forge, Forge–Quincy, Monarch Life or O'Connell. Confirmation would also "operate as a release of any ... obligations or liabilities of any kind." The Plan goes on to say that each holder of a claim "who votes to accept this Plan or whose class of claims votes to accept this Plan ... shall be deemed to have released [Forge, Forge–Quincy, Monarch Life and O'Connell]".

E. *Section 105 and the Partnership Decisions*

■ Apparently recognizing neither principles of contract law nor *res judicata* support the requested release and injunction, the Debtor concentrates its argument elsewhere. It relies upon the court's powers under section 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (1988). Without the injunction and release, the Debtor says, the "major contribution" of Sovereign on behalf of the other parties would not be possible, so that the resulting return to creditors would be "substantially less." The Debtor estimates Sovereign's contribution means a dividend in excess of 50% "may be achievable," whereas without it the dividend "might be in the range of 5–

6%". Stressing that the present case involves the release of co-venturers and not guarantors, the Debtor cites decisions involving chapter 11 proceedings of law partnerships which affirm a bankruptcy court's section 105 power to enter an injunction prohibiting creditor actions against the individual partners. *See, e.g., In re Heron, Burchette, Ruckert & Rothwell,* 148 B.R. 660 (Bankr.D.C.1992); *Myerson & Kuhn v. Brunswick Assoc. Ltd. Partnership (In re Myerson & Kuhn),* 121 B.R. 145 (Bankr. S.D.N.Y.1990).

There are factual as well as legal fallacies to this argument. Sovereign's proposed contributions appear to be only on behalf of Forge and Forge–Quincy, not Monarch Life or O'Connell. Nor am I convinced the contributions have any significant value. There may be no surplus proceeds whatsoever from foreclosure of Monarch Life's mortgages. And there is no solid indication that Sovereign's indebtedness would otherwise entitle it to more than its agreed one-third maximum share of the distribution to unsecured creditors. Also of questionable value is the agreed subordination of the Debtor's indebtedness to Forge, Forge–Quincy and O'Connell. Although principles of equitable subordination do not require subordination of indebtedness owed to an equity owner, subordination is proper if the equity holder has violated its fiduciary obligations. *E.g., Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). The Debtor recognizes equitable subordination may be the fate of the O'Connell debt. If this is so as to O'Connell's debt, there is no indication why the same possibility is not present concerning the debt of Forge and Forge–Quincy.

Beyond all this, the Debtor's reliance on decisions involving professional partnerships is misplaced. In a professional partnership case, contributions to the plan by individual partners often constitute the plan's prime funding. Typically, the funds available to creditors from the net worth of the professional partners far exceeds anything creditors might recover from the partnership itself. It usually makes sense in these cases, moreover, for creditors to

shun collection actions against the individual partners. Doing so avoids the extraordinary expense of multiple lawsuits, as well as the ultimate bankruptcies of many individual partners which would likely ensue and make only liquidation values available. And the partners can derive funds for the plan contributions from their future compensation, which is typically at high levels, funds which would not become assets of their bankruptcy estates. It is usually considered advisable to issue a temporary injunction against creditors suing those partners who are cooperating in the reorganizational effort, in order to preserve those partners as sources of funding pending agreement with the creditors' committee on a plan. *E.g., In re Myerson & Kuhn*, 121 B.R. 145 (Bankr.S.D.N.Y.1990). *Contra, Aboussie Bros. Constr. Co. v. United Mo. Bank of Kirkwood (In re Aboussie Bros. Constr. Co).*, 8 B.R. 302 (E.D.Mo.1981).

When the professional partners have committed themselves to make contributions to the plan in amounts satisfactory to the creditors' committee, it may or may not be proper for the court to continue the injunction postconfirmation. Certainly a factor favoring continuation would be the court's conclusion that creditors derive a benefit from the partners' contributions which at least equals whatever creditors would be likely to get from pursuit of remedies against individual partners. *See In re Myerson & Kuhn*, 121 B.R. at 157. Indeed, because a chapter 7 trustee of the partnership may proceed against the partners individually, 11 U.S.C. § 723 (1988), the best-interest-of-creditors test under section 1129(a)(7)(A)(i) requires the court to find that creditors will receive at least as much from the partners' contributions to the plan as they would from the assertion of a chapter 7 trustee's rights against the partners.

None of these considerations is present here. The parties who would benefit by the release and injunction are contributing nothing to the Plan. Most are apparently unable to do so. The Debtor admits O'Connell "does not have any significant assets" and the financial condition of Forge and Forge–Quincy "is precarious at best". Debtor's Disclosure Statement p. 24. Monarch Life can make a contribution but chooses not to contribute anything other than what it is already committed to pay to Sovereign. This case is thus far different from a professional partnership case where the partners are providing most of the plan funding. That gap is not closed by the contribution of uncertain value which Sovereign would make on behalf of some but not all of those who seek to benefit from the release and injunction.

## II. TREATMENT OF REAL ESTATE TAXES AS SECURED CLAIMS AND NOT AS ADMINISTRATIVE EXPENSES

Prudential and the City of Quincy contend the Plan cannot be confirmed because it fails to treat as an administrative expense, and pay in full, postpetition real estate taxes on the office building mortgaged to Prudential.

The Debtor filed its chapter 11 petition on July 1, 1992. On December 30, 1992 I entered an order granting Prudential relief from the automatic stay so that it could foreclose upon the property, which was far under water. The Debtor did not oppose the motion. On January 25, 1993, Prudential made entry and became a mortgagee in possession.

The fiscal year of cities and towns in Massachusetts begins on July 1st and ends on June 30th of the following calendar year. Mass.Gen.L. ch. 35, § 16 (1993). The Debtor's filing on July 1, 1992 was thus at the beginning of the City's 1992–93 fiscal year. Local real estate taxes are ordinarily assessed to "the person appearing of record ... as owner on January first." Mass.Gen.L. ch. 59, § 11 (1990). This assessment is made with respect to the fiscal year beginning the following July 1st. Mass.Gen.L. ch. 59, § 21 (1990). The mortgagor is deemed the owner until the mortgagee takes possession. Mass.Gen.L. ch. 59, §§ 11–12B (1990). The tax is based upon the value of property on January first. Mass.Gen.L. ch. 59, § 2A. A building erected on the property between Janu-

ary first and the beginning of the fiscal year on July first is deemed part of the property on January first. *Id.*

The assessment of the specific amount of the tax necessarily occurs much later. The tax rate cannot be fixed until it is approved by the Commissioner of Revenue of the Commonwealth. Mass.Gen.L. ch. 59, § 23 (1990). Traditionally, the assessment is not made, and bills are not sent out, until September or later in the fiscal year to which the assessment relates. The tax assessed nevertheless "shall with all incidental charges and fees be a lien thereon from January first." Mass.Gen.L. ch. 60, § 37 (1990).

In the fall of 1992, the City accordingly assessed to the Debtor the tax due on the property for the current fiscal year, based upon the City's valuation of the property as of the previous January first. Absent any considerations concerning the Debtor's pending chapter 11 proceeding, the tax assessed was a lien on the property "from January first." Mass.Gen.L. ch. 60, § 37.

Whether the tax so assessed is entitled to administrative expense priority, and hence under section 1129(a)(9)(A) to payment in full at confirmation, is not as clear as one might suppose. A tax "incurred by the estate" may be allowed as an "administrative expense." 11 U.S.C. § 503(b)(1)(B) (1988). The priority of such taxes is governed by section 507, which grants first priority to "administrative expenses allowed under section 503(b)." 11 U.S.C. § 507(a)(1) (1988). Section 507 goes on to provide more junior priority for various unsecured claims, including certain prefiling tax claims. Each of these priorities, including the seventh priority for prefiling taxes, applies only to "unsecured claims." 11 U.S.C. § 507(a)(2)–(8), (1988 & Supp. IV 1992).

I conclude from this statutory scheme that the first priority given to administrative expenses only applies if the right to payment of such expenses is unsecured. It would make little sense to interpret the statute otherwise. Section 506 affirms the status of a secured claim. As the holder of a secured claim, a municipali-

ty with a tax lien has obvious priority over all unsecured claims. And to read the administrative expense priority of section 507(a)(1) to include a secured claim makes that subsection inconsistent with the others, which expressly apply only to unsecured claims. Congress presumably avoided using the phrase "unsecured claim" in subsection (a) because it wished to confine use of the phrase to prefiling rights to payment.

The only decision brought to our attention addressing this question held a postfiling tax enjoying lien rights is not entitled to administrative expense priority. *In re Summit Ventures, Inc.*, 135 B.R. 483, 492 (Bankr.D.Vt.1991). Although there are statements in other decisions to the effect that property taxes assessed postpetition are entitled to administrative expense priority, the decisions indicate no recognition of the issue and rely upon cases involving taxes enjoying no liens. *See, e.g., In re Fairchild Aircraft Corp.*, 124 B.R. 488, 494 (Bankr.W.D.Tex.1991).

This does not completely answer the question of administrative expense priority, however. There is case law holding liens for real estate taxes assessed during a bankruptcy proceeding are void because imposition of the lien is in violation of the automatic stay. *E.g., Makoroff v. City of Lockport,* 916 F.2d 890 (3d Cir.1990) *cert. denied City of Lockport v. U.S.,* — U.S. ——, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991). In *Makoroff,* as in this case, the municipality made the assessment postpetition based upon a prepetition valuation date. The city sought to rely on the exception to the automatic stay for an "act to perfect an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title." 11 U.S.C. § 362(b)(3) (1988). Under section 546(b), the rights and powers of a trustee are subject to "any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection." 11 U.S.C. § 546(b) (1988). The city argued in *Makoroff* that

its postpetition assessment perfected its prepetition "interest in property" within the meaning of section 546(b). The Third Circuit disagreed, holding that under the applicable state tax statutes no lien arose until notice of the tax assessment was published postpetition. The court observed the statutes contained no language relating the lien back to the prepetition valuation date. It regarded the valuation date as merely a date which identifies the taxpayer and fixes the value of the property, arbitrarily chosen for ease in tax administration. Conceding that in an abstract sense a municipality has an ever-present interest in real estate within its jurisdiction, the court concluded section 546(b) requires a more specific property interest. *Accord Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80 (3d Cir.1989).

The Second Circuit has gone the other way. *See In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540 (2d Cir.1989), *cert. denied* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990). *Parr Meadows* dealt with the same New York statutory scheme before the court in *Makoroff.* But the Second Circuit attached more significance than did the Third Circuit in *Makoroff* to the prepetition status of the valuation date, noting that the date controlled valuation notwithstanding any subsequent changes in the condition or use of the property. The court ruled the significance of this date for valuation purposes gave the city a sufficient prepetition "interest in property" within the meaning of section 546(b) to validate the postpetition assessment under section 362(b)(3).

The Fourth Circuit went further in *Maryland National Bank v. Mayor and City Council of Baltimore*, 723 F.2d 1138 (4th Cir.1983). It there validated tax liens derived from a postpetition assessment based upon a valuation date which was also postpetition. The court believed it significant that under the Maryland statutes taxes have a priority claim to foreclosure sales proceeds so long as they are payable at the time of distribution of the proceeds, even though not payable at the time of foreclosure. *Id.* at 1142. But the Fourth Cir-

cuit seemed to place its greatest reliance upon what it regarded as the state's longstanding interest in the property, which it regarded as transcending the significance of a valuation date. *Id.* at 1143–44. And the court noted the benefits which the property derived from the city in protection from vandalism and maintenance of streets. Outside of bankruptcy, the court observed, owners and mortgagees alike expect property taxes to be a first lien. In light of this, the court believed not granting priority to the tax would bring "pure manna from heaven" to the owner and mortgage holder. *Id.* at 1146. The Second Circuit in *Parr Meadows* declined to validate tax liens related to postpetition valuation dates. 880 F.2d at 1547–49. It believed without the presence of a prepetition valuation date the municipality has an insufficient "interest in property" under section 546(b) at the time of the bankruptcy filing. *Id.*

Here the valuation date occurred prepetition, so the lien would be validated under the reasoning of *Parr Meadows* as well as *Maryland National Bank. Makoroff* can be distinguished from the present case. Unlike the New York statute before the court there, the Massachusetts statute provides "[t]axes assessed upon land ... shall ... be a lien thereon from January first in the year of assessment." Mass.Gen.L. ch. 60, § 37. The objecting parties concede, moreover, that only property taxes incurred prepetition are subject to disallowance under section 502(b)(3) on the ground the claim "exceeds the value of the interest of the estate in such property." 11 U.S.C. § 502(b)(3) (1988). *See, e.g., In re Pioneer Title Bldg., Ltd.*, 133 B.R. 822, 824–25 (Bankr.W.D.Tex.1991); *In re Wendy's Food Systems, Inc.*, 117 B.R. 333 (Bankr. S.D.Ohio 1990); *In re Spruill*, 78 B.R. 766, 772 (Bankr.E.D.N.C.1987).

But postpetition tax assessments are not an easy fit under section 546(b), even though the lien relates back to the January first valuation date. This is so for three reasons, none of which is discussed in *Makoroff, Parr Meadows* or *Maryland National Bank.*

First, the tax debt and lien both arose from the same act of assessment. If we were dealing here with a consensual lien controlled by the Uniform Commercial Code, there could be no prepetition security interest without the giving of value. Mass. Gen.L. ch. 106, § 9–203 (1984). Value is typically given when the debt is created. The same considerations would appear to apply to nonconsensual statutory liens. Without a debt or other contractual commitment, there is simply nothing for the lien to secure. I thus have trouble understanding how the *Parr Meadows* or *Maryland National Bank* courts could find a pre-existing "interest in property" under the statute.

Second, it is difficult to consider a municipality's assessment of taxes as an act of "perfection" within the meaning of section 546(b). In light of the enactment of the Uniform Commercial Code in all the states, the term "perfection" is most logically interpreted in the sense used in the U.C.C. The concept of perfection under that law requires an act which gives notice to others. A secured party's interest in collateral is perfected either through possession or filing. Mass.Gen.L. ch. 106, §§ 9–302, 9–305. The example given in the legislative history of section 546(b) uses perfection in this sense. The House and Senate reports both refer to the retroactive perfection accorded by the U.C.C. to filing under a purchase money security interest if the filing takes place no later than ten days after the debtor acquires possession of the collateral. H.R.Rep. No. 595, 95th Cong., 1st Sess. 371 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 86 (1978) U.S.Code Cong. & Admin.News pp. 5787, 5872, 6327.

That Congress had in mind an act which gives notice to creditors is also supported by the wording of section 546(b) itself. The statute refers to "seizure" of property and "commencement of an action" as possible acts of perfection. And as if to emphasize the public notice Congress had in mind, the statute goes on to say "such interest in property shall be perfected by notice within the time fixed by law for such seizure or commencement." 11 U.S.C. § 546(b) (1988).

The act of assessment by the City of Quincy here lacks the feature of public notice. It consisted of the City's determination on its records of the amount of the tax bill. This was done in the bowels of city hall. True, the tax rate had been publicly announced previously, and tax bills were sent out shortly thereafter. But the retroactive lien arose from the act of assessment itself. Mass.Gen.L. ch. 60, § 37. That act simply lacks the notice features normally associated with perfection.

Also militating against application of section 546(b), and hence section 362(b)(3), is the purpose of section 546(b). Section 546(b) states its effect is to limit the "rights and powers of a trustee under sections 544, 545 and 549." Section 544 is the section having prime application here. It gives the trustee (or debtor in possession) the rights of a hypothetical bona fide purchaser of real property or of a judicial lien creditor, who enjoys that status as of the time of the filing of the bankruptcy case. But the City of Quincy needs no section 546(b) protection from a trustee having such hypothetical status. In Massachusetts, the tax lien of a city or town enjoys automatic priority over pre-existing interests in the property. *Wiggin v. Lowell Five Cent Sav. Bank*, 299 Mass. 518, 521, 13 N.E.2d 433, 436 (1938); *Equitable Trust Co. of New York v. Kelsey*, 209 Mass. 416, 95 N.E. 850 (1911).

The practical approach taken in *Maryland National Bank* is nevertheless appealing. There is manifest unfairness in denying lien priority to a municipality in light of the typical expectation of such priority by the parties, and in light also of the benefits the property derives from municipal services, as well as the good faith of the municipality in making the assessment.

I need not, however, decide this difficult question. Although not argued by the Debtor, there is a way to validate the asserted tax lien without making a labrynthian interpretation of sections 362(b)(3) and 546(b).

■ Had the City requested relief from the automatic stay prior to making its assessment, there is no question in my mind I would have granted relief. The City's normal lien priority outside bankruptcy and its good faith in employing its customary lien mechanism, as well as the benefits the City confers upon the property, certainly constitute "cause" to authorize imposition of the lien under section 362(d)(1). I therefore validate the postpetition assessment. My power to do this retroactively is clear. Although acts in violation of the automatic stay are generally void, the bankruptcy court in which the case is pending may validate them. *Interstate Commerce Comm'n v. Holmes Transp., Inc.*, 931 F.2d 984, 987–88 (1st Cir.1991); *Schulz v. Holmes Transp, Inc.*, 149 B.R. 251 (D.Mass.1993). The most common instance in which I grant such relief involves a mortgagee lacking adequate protection who forecloses without knowing of the debtor's recent bankruptcy filing. The equities here are equally compelling. As the first lien holder, the City has first claim to the foreclosure sales proceeds.

## III. NONIMPAIRMENT OF PRUDENTIAL'S CLAIM

Prudential's claim is based upon a $15,-300,000 note secured by a mortgage on the office building parcel, plus an assignment of rents and a security interest in related personal property. On December 30, 1992, I authorized Prudential to foreclose upon its mortgage and security interest. The Debtor did not contest the motion. On January 5, 1993, six months after the chapter 11 filing, Prudential filed a motion for an order requiring the Debtor to segregate rents received from the office building. The motion also sought to require the Debtor to pay real estate taxes on the property and to turn over to Prudential any excess of rental revenues over operating expenses. Prior to the hearing on the motion, pursuant to the December 30th order Prudential made entry upon the property on January 25th and conducted a foreclosure sale on March 31st. It purchased the property at the sale with a bid of $6,525,205, some $8,000,000 less than the debt balance. Thereafter, on April 7, I denied Prudential's motion concerning the rents.

The Plan states Prudential's "claim" is unimpaired by reason of the claim having been "fully satisfied" through Prudential taking possession of the property and thereafter purchasing it. To the contrary, says Prudential, the Plan impairs its claim in three ways: (i) in failing to recognize Prudential's security interest in rents collected and remaining undisbursed, (ii) in failing to require payment of all prepetition and postpetition real estate taxes on the office building parcel, which results in priority tax liens diminishing the value of Prudential's mortgage interest, and (iii) in failing to provide for payment on Prudential's deficiency claim exceeding $8,000,000.

### A. *Prudential's Interest in Rents*

The Debtor has a substantial cash balance. It has not, however, segregated these funds as to the properties from which they are derived. Thus there is a tracing problem, even if one assumes Prudential has an enforceable interest in the rents.

■ There are other more basic deficiencies to Prudential's claim to the collected rents. Prior to Prudential taking possession of the property, its assignment of rents gave it only an inchoate security interest in the rents under Massachusetts law. *In re Prichard Plaza Assoc., Ltd. Partnership*, 84 B.R. 289 (Bankr.D.Mass. 1988). That inchoate interest does not defeat the Debtor's right to collect and retain the rents. *Id.* Although the bankruptcy judges of this district have taken different views on what type of possession makes the interest choate, we are uniform in holding some form of possession is required. *See In re Cantonwood Assoc., Ltd. Partnership*, 138 B.R. 648 (Bankr.D.Mass.1992) (peaceable entry only upon land, filing of certificate of entry and notice to tenants sufficient); *In re Ashford Apartments Ltd. Partnership*, 132 B.R. 217 (Bankr. D.Mass.1991) (same); *In re Ledgemere Land Corp.*, 116 B.R. 338 (Bankr.D.Mass.

1990) (actual control of premises required); *In re Milford Common J.V. Trust,* 117 B.R. 15 (Bankr.D.Mass.1990) (actual or constructive possession required).

■ Under any of these views, Prudential's possession commenced no earlier than January 25th. The Debtor collected no rents thereafter. The subject of security interests in rents is a tangled web, even beyond questions relating to possession. Some courts require no possession at all. There appears to be no decision, however, which gives retroactive effect to whatever action is required to change the mortgagee's interest from inchoate to choate. Even courts that regard a postpetition sequestration motion as a sufficient triggering event to bring about a choate interest do not go that far. They make the motion effective only with respect to rents due thereafter. *See, e.g., In re Vienna Park Properties,* 976 F.2d 106 (2d Cir.1992); *Casbeer v. State Federal Savings & Loan Ass'n (In re Casbeer),* 793 F.2d 1436, 1443 (5th Cir.1986).

### B. *Plan's Failure to Require Payment of Real Estate Taxes*

■ The Plan's failure to require payment of accrued real estate taxes adversely affects Prudential because of the first priority enjoyed by the tax liens. But that is not equivalent to the Plan impairing Prudential's claim. A claim is not impaired under a plan if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim ... entitles the holder of such claim." 11 U.S.C. § 1124 (1988). The Plan's failure to require payment of real estate taxes does not fall within this language. Although the failure adversely affects the value of Prudential's property interest, the Plan does nothing to alter Prudential's rights.

The Code's standard of impairment is far different from its analogue under the prior Bankruptcy Act, which granted rights if a claimant's "interest" was "materially and adversely" affected by the plan. Bankruptcy Act of 1898 §§ 107, 308, 11 U.S.C. §§ 507, 708 (1976) (repealed 1978). That language was considered broad enough to

apply to a claim for which the plan made no provision. 8 Collier on Bankruptcy, ¶ 2.42 at 106–8 (14th ed. 1978). It presumably would have encompassed what has been done to Prudential here.

This is not to say nonpayment of real estate taxes has no bearing upon Prudential's former secured claim. Even if the Debtor had contested Prudential's motion for relief from stay, I would have granted the motion unless the Debtor paid the taxes. The encroaching priority tax lien deprived Prudential of adequate protection by diminishing the value of Prudential's undersecured mortgage interest. *See, e.g., In re Robbins,* 119 B.R. 1 (Bankr.D.Mass. 1990). But that is a different issue. And Prudential obtained stay relief.

### C. *Plan's Failure to Provide Payment on Prudential's Asserted Deficiency Claim*

The Plan treats Prudential as having no deficiency claim, even though the purchase price at foreclosure was some $8,000,000 less than the amount of the debt. The Plan does so because Prudential's note says Prudential "shall not seek or obtain any deficiency judgment" against the Debtor or its joint venturers, unless certain events occur.

A preliminary point not argued by the parties deserves mention. A "claim secured by a lien on property of the estate" is to be treated as a recourse claim even though its terms provide for no recourse, unless the class of claims of which it is a part elects secured claim status, or unless the collateral is sold. 11 U.S.C. § 1111(b) (1988). This provision, however, has no application to Prudential at this point because as the result of its foreclosure Prudential no longer has a claim secured by a lien on property of the estate. Prudential's rights must therefore be considered without regard to the magic of section 1111(b).

■ Prudential contends there has been the occurrence of one of the events which ends the nonrecourse nature of its claim. It points to the event described in the following note provision: "If Maker misapplies any of the gross revenues from said

Premises, operating and maintenance expenses, insurance premiums, deposits in reserve for replacements, or other sums required by the Security Documents, upon the earlier to occur of the failure of Maker to make any payments, when due, hereunder or upon a Default." Returning to its favorite topic—real estate taxes—Prudential contends the Debtor's failure to pay real estate taxes constitutes misapplication of gross revenues within the meaning of this clause.

The verb "misapplies," however, connotes positive action—payment rather than nonpayment. Moreover, unless there is an earlier default unrelated to nonpayment, misapplication can occur under this provision only in conjunction with the Debtor's failure to make a payment when due. Because the loan documents required the Debtor to pay taxes, the Debtor's failure to make tax payments is such a failure. But it cannot also be a misapplication. The note treats the two as different occurrences. Any ambiguity in this provision, furthermore, must be construed against Prudential as the drafter.

■ There is another reason Prudential holds no unsecured claim. In the course of its foreclosure proceeding, Prudential failed to give the notice of deficiency liability required by Massachusetts statute. The holder of a mortgage on Massachusetts real estate may bring no postforeclosure action for a deficiency unless the holder gave the debtor a twenty-one day, registered mail, notice of the holder's intention to foreclose "together with a warning of liability for the deficiency." Mass.Gen.L. ch. 244, § 17B (1993). On March 17, 1993, Prudential gave written notice to Forge–Quincy of its intention to foreclose by sale on or after March 31, 1993. The notice contained no warning of liability for a deficiency, nor was it dated early enough to give the required twenty-one day notice.

Prudential asserts technical compliance with the statutory notice requirements is excused if the mortgagor had actual notice of the impending foreclosure sale, citing *Fairhaven Savings Bank v. Callahan*, (1983) Mass.App.Div. 179 *aff'd* 391 Mass.

1011, 462 N.E.2d 112 (1984); *Cape Cod Bank & Trust Co. v. Rasmussen*, (1981) Mass.App.Div. 150. The cited cases both involve correctly worded notices. The problem in one was an improper method of mailing and in the other an incorrect address. The decisions simply hold the mortgagee's presence at the sale warranted findings of actual receipt of the notices. They do not excuse failure to give written notice of a potential deficiency liability. Nor were the notices seven days short of the required twenty-one day notice period, as was the case here. The Supreme Judicial Court of Massachusetts has stressed the importance of complying with the notice requirement. *Wornat Development Corp. v. Vakalis*, 403 Mass. 340, 529 N.E.2d 1329 (1988).

## IV. CLASSIFICATION OF O'CONNELL CLAIM AS SUBORDINATED

■ O'Connell has agreed to subordinate its claim to the general unsecured claims in consideration of its proposed release under the Plan. Having ruled the injunction and release are invalid, I now turn to O'Connell's conditional objection to the Plan's provision placing its claim in a subordinated class with those of Forge and Forge–Quincy. The Plan provides these three claims are to receive nothing until other unsecured claims are paid in full. The Debtor contends O'Connell's claim is an unsecured claim subject to equitable subordination under section 510(c). O'Connell says its claim should have been placed in the same class as all general, unsecured claims.

Section 1122 governs classification of unsecured claims. It provides in part:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

The statute is not a model of draftsmanship. Clearly a claim may be placed in the same class as other claims "only if such claim ... is substantially similar to the

other claims ... of such class." What is far from clear, however, is whether the plan must place all "substantially similar" claims into one class.

Courts have taken several approaches to this issue. Some interpret section 1122 as implying no requirement for unitary classification. *E.g., AG Consultants Grain Div., Inc.,* 77 B.R. 665 (Bankr.N.D.Ind. 1987); *In re The Mason & Dixon Lines, Inc.,* 63 B.R. 176 (Bankr.M.D.N.C.1986); *In re White Horse Grain Co.,* 60 B.R. 16 (Bankr.E.D.Pa.1986). Others require classification in accordance with the legal priority of the claims. *E.g., Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund,* 748 F.2d 42 (1st Cir.1984); *In re Planes, Inc.,* 48 B.R. 698 (Bankr.N.D.Ga.1985); *In re Pine Lake Village Apartments Co.,* 19 B.R. 819 (Bankr.S.D.N.Y.1982). Most adopt neither of these polar positions. Rather, they recognize the absence of any express mandate for unitary classification but permit separate classification only in restricted circumstances. *E.g., Hanson v. First Bank of South Dakota,* 828 F.2d 1310 (8th Cir. 1987); *In re U.S. Truck Co.,* 800 F.2d 581 (6th Cir.1986); *Steelcase v. Johnston (In re Johnston),* 140 B.R. 526 (Bankr.9th Cir. BAP 1992). In *U.S. Truck,* for example, the court approved separate classification of a union's claim because of the union's substantial noncreditor interests concerning continued employment.

I am of course bound by the First Circuit's decision in *Granada Wines.* The court there relied upon old chapter X cases and denied separate classification for a claim having the same legal priority as other unsecured claims. The Debtor apparently believes the *Granada Wines* standard is met here because of the subordinated nature of O'Connell's claim. But I have issued no order equitably subordinating O'Connell's claim. The Debtor will have to bring an adversary proceeding requesting such an order. Fed.R.Bankr.P. 7001. The Plan cannot be confirmed unless and until O'Connell's claim is equitably subordinated in such a proceeding.

## IV. MISCELLANEOUS ISSUES

The objecting parties raise other issues which need not detain us long. The City of Quincy asserts there are unpaid prefiling taxes which are entitled to a seventh priority under section 507. Since the filing of the City's objection, the Debtor has apparently made arrangements for payment of such taxes. In any event, as observed in part II of this opinion, the priorities granted under section 507 are confined to unsecured claims. Other grounds for objections filed by various parties either raise similar tax issues or are not worthy of discussion.

A separate order has issued denying confirmation of the Plan.