**In re WEST COAST VIDEO
ENTERPRISES, INC.,
Debtor.**

**Bankruptcy No. 92–11076DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 7, 1994.

John E. Kaskey, Fellheimer, Eichen & Braverman, Marc G. Mellman, Klehr, Harrison, Harvey, Branzburg & Ellers (co-counsel), Philadelphia, PA, for debtor.

Jack C. Briscoe, Ralf W. Greenwood, Jr., Strong, Stevens, Briscoe & Hamilton, Philadelphia, PA, for movants.

J. Scott Victor, Saul, Ewing, Remick & Saul, Philadelphia, PA, for former Creditors' Committee of debtor.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

In the aftermath of confirmation of the plan of reorganization and closure of the Chapter 11 bankruptcy case of a well-known franchisor of video rental stores, WEST COAST VIDEO ENTERPRISES, INC. ("the Debtor"), MICHAEL and MARILYN WILLIAMS ("the Movants"), former franchisees of the Debtor, seek to reopen the case to determine their rights to make a late claim in this case and to proceed with pending state court litigation against the Debtors and certain of its principals who were allegedly beneficiaries of releases in the Debtor's confirmed Plan.

We hold that the Movants, as parties whom the Debtor could not reasonably have known had a claim against it, for that reason received adequate notice of the pendency of this case, so as to bar any claim against the Debtor's estate. However, we also find that the Plan was ineffective to bar the Movants' claims against the Debtor's principals, as the Movants in no sense affirmatively agreed to the principals' releases. We relegate to the state court the issue of the validity of the Movants' pre-petition release of the principals, although we note the weakness of the Movants' claims on this issue. We also will

deny a cross-motion of the Debtor for contempt against the Movants, as their bankruptcy law contentions were at least partially successful.

## B. PERTINENT PROCEDURAL AND FACTUAL HISTORY

The Debtor filed its voluntary Chapter 11 case in this court on February 25, 1992. The Debtor presented evidence at the hearing on the matters at issue establishing that its filing received considerable media publicity on several local television stations and was the subject of several local newspaper and trade journal articles. The headline of the Business section of the Philadelphia Inquirer of February 26, 1992, read: "West Coast Video files for Chap. 11 protection."

Significant participation by several of the Debtor's franchisees, as well as a cross-section of creditors' interests, contributed to making this case a relatively complex, high-profile matter. The Debtor filed its first plan of reorganization on August 3, 1992, and an extended period of negotiation ensued before the Debtor's Third Amended Plan of Reorganization ("the Plan") was confirmed by Order of November 25, 1992. The Plan provided that, in the discharge which resulted from confirmation, members of the various classes of creditors released not only the Debtor, but also several of its principals and the Debtor's principal secured lender, Corestates Bank ("Corestates"), from liability. The members of the Class 5A, consisting of franchisee claims, and hence potentially containing the Movants' claims, specifically were said to have released Elliot Stone, the Debtor's chief executive officer ("Stone"); Richard Abt, Esquire, its house counsel ("Abt"); and Corestates, as well as the Debtor, from all claims in consideration for the payments to be made to these class members under the Plan. See § 3.5(d) of the Plan.

After an extended period of litigation of post-confirmation objections to claims by the Debtor, the last of which involved the Pennsylvania Department of Revenue, this case was quietly closed on May 18, 1994, after the entry of a Final Decree of March 24, 1994.

On or about May 5, 1994, the Movants filed an action in the Court of Common Pleas of Philadelphia County ("the C.P. Suit"), seeking monetary damages against the Debtor, Stone, and three other principals or former principals of the Debtor, Harold G. Stone, Stone's father; John H. Barry; and Al Biscardi, for allegedly misrepresenting the parties' franchise agreement in connection with the Movants' purchase of a franchise of the Debtor located in Ocean City, Maryland.

Several months later, on September 21, 1994, the Movants filed a "Motion to Open [this case] Pursuant to 11 U.S.C. Section 350(b) and Petition for Declaratory Judgment ("the Motion") in this court. It is unclear whether any event in the administration of the C.P. Suit sparked the filing of the Motion. The Motion hints that the Movants may have considered this court as an appropriate alternative forum for quickly litigating their claims against the Debtor. In any event, the specific relief requested by the Movants in the Motion was a declaration that the confirmation Order did not bar the C.P. Suit as to either the Debtor, Stone, or the other three defendant principals. The Debtor responded, on October 20, 1994, with, *inter alia,* a cross-motion seeking to hold the Movants in contempt of the confirmation Order for prosecuting the C.P. Suit ("the Cross–Motion").

The Motion and the Cross–Motion were heard together by this court on November 9, 1994. At the close of the hearing, we accorded the Movants and the Debtor until November 21, 1994, and November 28, 1994, respectively, to file post-hearing briefs.

The Movants, who have at all times resided in Lafayette Hill, Pennsylvania, a Philadelphia suburb, both testified at the hearing. They described their unsuccessful venture as absentee owners of the Debtor's Ocean City franchise between March 31, 1989, and December 31, 1991, in which they lost all of their life savings. Both Movants also claimed that long work hours caused them to devote very little attention to the news media. Although they and their 19–year–old daughter have been customers of the Debtor since 1988, and they were franchisees of the Debtor for over two and a half years, they claimed to have been totally unaware of the

Debtor's bankruptcy until their counsel advised them of its existence in 1993.

The Movants exited their franchise, in which they claimed to have invested almost $300,000, by selling it, on December 31, 1991, to a corporation known as Max Enterprises, Inc. ("Max"), for $140,000. At the settlement table in this sale transaction, counsel for Max presented them with a release of the Debtor, "its officers, directors, affiliates, shareholders, agents and servants," from all liability. The Movants, not represented at settlement by their own counsel, initially balked at signing this release. The parties then contacted Abt at a vacation residence to get his legal opinion regarding this matter. Abt, not surprisingly, insisted that the execution of the release was an absolute condition for the Debtor's agreeing to allow Max to become a replacement franchisee for the Movants. The Movants then reluctantly signed the release.

On cross-examination, the Husband–Movant admitted that requiring the execution of the release was probably consistent with certain terms of the Movants' original franchise agreement. In the direct examination of Stone, the Debtor's only witness, it was asserted that Max had assumed the Movants' liability to the Debtor in the transaction in exchange for the release, and had become a successful franchisee. Stone also claimed that he had suffered continuing personal embarrassment because "everybody in the entire state of Pennsylvania, South Jersey [sic], Delaware, and a couple other states thrown in, knew about the bankruptcy" due to the high level media interest and exposure.

## C. DISCUSSION

### 1. THE MOVANTS WERE NOT "KNOWN CREDITORS" OF THE DEBTOR, AND THEREFORE THE MEDIA PUBLICITY WAS SUFFICIENT TO PUT THE MOVANTS ON NOTICE OF THE CASE AND BIND THEM TO THE CONFIRMATION ORDER AS TO THE DEBTOR.

■ The Movants argue that the principles of the process of law emanating from the decision in *Mullane v. Central Hanover*

*Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950), preclude their suffering adverse legal consequences from the confirmation Order in the Debtor's case on the basis of mere publication notice. It is also well established that the right of a known creditor of a debtor in bankruptcy to file a claim cannot be cut off without actual notice to that creditor of the bar date for filing claims. *City of New York v. New York, N.H. & H.R.R.,* 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953).

■ However, a key element to the *Mullane* result was the fact that the trustee who resorted to publication notice of the settlement of its accounts knew that the beneficiaries were parties interested in these accounts, and had ready access to their addresses to make personal service. On the other hand, it is well established that a bankruptcy debtor need provide only suitable publication notice to its "unknown creditors." *See In re Chicago, M., St. P., & P. R.R.,* 974 F.2d 775, 788–89 (7th Cir.1992); *In re GAC Corp.,* 681 F.2d 1295, 1300 (11th Cir.1982); *In re Waterman Steamship Corp.,* 157 B.R. 220, 222 (S.D.N.Y.1993); *In re Schepps Food Stores, Inc.,* 152 B.R. 136, 137–39 (Bankr. S.D.Tex.1993); *In re Drexel Burnham Lambert Group, Inc.,* 151 B.R. 674, 679–81 (Bankr.S.D.N.Y.1993); *In re Bicoastal Corp.,* 147 B.R. 807, 809 (Bankr.M.D.Fla.1992); *In re Hunt,* 146 B.R. 178, 182 (Bankr.N.D.Tex. 1992); and *In re Thomson McKinnon Securities, Inc.,* 130 B.R. 717, 720 (Bankr. S.D.N.Y.1991).

"Known creditors" have been defined as creditors that a debtor knew or, should have known of, when serving notice of the bar date. Among known creditors may be parties who have made a demand for payment against a debtor in one form or another before the compilation of a debtor's schedules. Typically, a known creditor may have engaged in some communication with a debtor concerning the existence of the creditor's claim. This communication by itself does not necessarily make the creditor known. Direct knowledge based on a demand for payment is not, however, required for a claim to be considered "known." A known claim arises from facts

that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it.

*Drexel Burnham, supra,* 151 B.R. at 681 (footnote omitted). Meanwhile,

[u]nknown creditors include those whose identities or claims are not "reasonably ascertainable" and those who have merely conceivable, conjectural, or speculative claims. *See* [*Tulsa Professional Collection Services, Inc. v.*] *Pope,* [485 U.S. 478, 490, 108 S.Ct. 1340, 1347–48, 99 L.Ed.2d 565 (1988) ]; *Matter of GAC Corp.,* 681 F.2d at 1300.

*In re Charter Co.,* 125 B.R. 650, 655 (M.D.Fla.1991) (footnote omitted).

■ It is quite clear that the Debtor had no knowledge that the Movants were among its creditors at any time during the course of its bankruptcy case, nor did it have any reason to know that they claimed to be its creditors during that period. Admittedly, the Movants made no claim for any payment from the Debtor from the time that they sold their franchise in December, 1991, until they filed suit against the Debtor in May, 1994. The Debtor's case was completely administered from start to finish within the intervening time-period. Especially since they executed a comprehensive release to the Debtor when their franchise was sold, only the broadest sort of conjecture or speculation could have caused the Debtor to consider the Movants as its creditors. Therefore, the Movants were "unknown creditors" to whom publication notice of significant events in the Debtor's bankruptcy filing was adequate to bind them to orders entered therein.

■ We recognize that there is no evidence that the Debtor provided any formal or official sort of publication notice to its "unknown" creditors of the bar date, the confirmation hearing, or any other pertinent benchmarks in its case. However, such notices, typically printed in compact fashion among other miscellaneous legal notices in large newspapers, are extremely unlikely to catch the eye of lay persons such as the Movants. While we believe that Stone exaggerated the penetration of publicity and public knowledge about the Debtor's filing, there is no question that this publicity was quite likely to be noticed by lay persons, to a much greater degree than an obscure legal notice. We find that the Movants also exaggerated their isolation from the local news media. It seems quite unlikely that parties who were former franchisees as well as regular customers of the Debtor would not have sensitized antennae for news about the Debtor which would have caused them to learn of the bankruptcy. Furthermore, even if this were so, it is doubtful that relatives or friends who were less isolated from the news media would not, knowing their previous involvement with the Debtor, have mentioned the filing to them or asked them about it. Nevertheless, as it is not necessary to do so in making our disposition of the matters before us, we will stop just short of discrediting the Movants' claim of complete ignorance of the filing during the entire period of the administration of the case.

Assuming *arguendo* the Movants' unlikely lack of actual knowledge of the Debtor's bankruptcy, we nevertheless conclude that the publicity of the Debtor's bankruptcy case, particularly at its outset, provided reasonable notice of the Debtor's bankruptcy filing to them, which would have permitted them to access all information relevant thereto, including the bar date and the terms of the Plan, had they chosen to investigate the matter further. We therefore conclude that the Movants must be deemed subject to the Debtor's discharge injunction and precluded from pursuing at least the Debtor itself in furtherance of their potential claims against it.

2. SINCE THE MOVANTS DID NOT AFFIRMATIVELY AGREE TO RELEASES OF THE NON–DEBTOR PRINCIPALS OF THE DEBTOR IN THE DEBTOR'S PLAN, THEY ARE NOT SUBJECT TO THESE RELEASES BY WAY OF CONFIRMATION OF THE PLAN.

The Movants' citation of *In re Master Mortgage Investment Fund, Inc.,* 168 B.R. 930, 934–37 (Bankr.W.D.Mo.1994), in the post-trial brief, as a case articulating the emerging rule that 11 U.S.C. § 524(e) of the

Code does not, on its face, preclude a release of related non-debtors in a debtor's plan in at least certain circumstances, is accurate. *Accord,* H. Feldstein, *Reinterpreting Bankruptcy Code § 524(e): The Validity of Third–Party Releases in a Plan,* 22 CAL. BANKR.J. 25, 31–38 (1994). However, it is somewhat curious that, as advocates, the Movants prominently reference an authority which rejects the prior authorities which have held that § 524(e) bars releases of non-debtors under any conditions. *See, e.g., Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985); *In re Boston Harbor Marina Co.,* 157 B.R. 726, 730–31 (Bankr.D.Mass.1993); and P. Boyle, *Non–Debtor Liability in Chapter 11: Validity of Third–Party Discharge in Bankruptcy,* 61 FORDHAM L.REV. 421, 438–44 (1992).

■ Nevertheless, this court agrees with the general principle asserted in *Master Mortgage* that § 524(e) does not preclude inclusion of non-debtors' releases in a plan. However, we have added to this principle the corollary that each creditor bound by the terms of the release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise. *See In re Swedeland Road Corp.,* 1992 WL 111112, *2 (Bankr.E.D.Pa. May 19, 1992); and *In re 222 Liberty Associates,* 108 B.R. 971, 996–97 (Bankr.E.D.Pa.1990). Most authorities support this corollary, *see In re Specialty Equipment Cos., Inc.,* 3 F.3d 1043, 1047 (7th Cir.1993); *In re AOV Industries, Inc.,* 792 F.2d 1140, 1151–52 (D.C.Cir.1986); *In re Market Square Inn, Inc.,* 163 B.R. 64, 66–68 (Bankr.W.D.Pa.1994); and *In re Monroe Well Service, Inc.,* 80 B.R. 324, 334–36 (Bankr.E.D.Pa.1987).

It appears that the *Master Mortgage* court was prepared to go behind this corollary, and allow even non-consensual releases of non-debtors in a plan if the following five criteria were met:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

168 B.R. at 935 (footnotes omitted). These criteria are very demanding and, as is appropriate, correlate very closely with the criteria for allowing the bankruptcy stay to be extended to non-debtor parties, as articulated in *In re University Medical Center,* 82 B.R. 754, 757 (Bankr.E.D.Pa.1988); and *In re Monroe Well Service, Inc.,* 67 B.R. 746, 752–53 (Bankr.E.D.Pa.1986).

■ Upon engaging in the analyses of applying the rule on releases of non-debtors articulated by this court or the criteria of *Master Mortgage,* it becomes readily apparent that the releases of non-debtors included in the Plan cannot be enforced against the Movants. Clearly, the Movants did not cast a vote in favor of the Plan or otherwise affirmatively agree to release the Debtor's principals in connection with this case. According to the Movants, they never knew about this case and therefore could not have possibly cast such a vote or agreed to the releases. As to the five *Master Mortgage* criteria, we note that there is no evidence to support the presence of either the second, the third, or the fifth of these criteria on the record before us.

We do not believe that the entry of the confirmation order insulates the Debtor or its principals from arguments that the release contained in the Plan is not binding as to the Movants. In *Mellon Bank v. Siegel,* 96 B.R. 505 (E.D.Pa.1989), the court invalidated a confirmation order containing a third-party release, even though the creditor objecting to the third-party release had not voted against or objected to the plan despite receipt of notice of its right to do so. *But see*

**912**

*In re Davis Broadcasting, Inc.,* 169 B.R. 229 (Bankr.M.D.Ga.1994) (creditor who voted in favor of a plan cannot later challenge releases included therein). Here, the Movants' admitted failure to obtain notice of the confirmation process must, under precepts of due process of law, allow them to challenge the releases of the principals via the Plan at this juncture. We note that none of the publicity about the Debtor's case ever divulged that releases of any of the Debtor's principals was in issue, and we find that there was no basis for any creditor, known or unknown, to instinctively anticipate that the Debtor's Plan would include any such provisions.

Furthermore, even if we validated the releases provided for in the Plan, the C.P. Suit would not be eliminated. The releases, as to the franchisees' class into which the Movants would appear to fit, only extend to Stone, Abt, and Corestates. In the C.P. Suit, the defendants, in addition to the Debtor and Stone, are Stone's father, Harold G. Stone, John H. Barry, and Al Biscardi. The latter three individuals are not protected by the Plan releases, although we note that Harold G. Stone was discharged from his debts in what became a no-asset Chapter 7 case of his own, in Bankr. No. 92–15719DAS. Therefore, we conclude that, of the C.P. Suit defendants, only the Debtor itself is validly relieved from liability as a result of the terms of the Plan.

3. OTHER ISSUES: A FINDING OF CONTEMPT AGAINST THE MOVANTS IS NOT APPROPRIATE BUT, ALTHOUGH WE DECLINE TO FINALLY DECIDE THE ISSUE, WE NOTE THAT THE PRESENCE OF THE PRE–PETITION RELEASE MAY WELL PRECLUDE THE MOVANTS FROM SUCCEEDING IN THE C.P. SUIT.

■ In the Cross–Motion, the Debtor seeks to obtain monetary compensation and attorneys' fees from the Movants because of their alleged violation of the terms of the Plan and the discharge injunction arising from 11 U.S.C. §§ 524(a)(2), (a)(3) in their filing and pursuing the C.P. Suit. However, while we have held that the Movants cannot continue to maintain the C.P. Suit against the Debtor by effect of the discharge injunction, we have also held that the Movants are entitled to pursue the C.P. Suit against the Debtor's principals or ex-principals sued therein.

Furthermore, no actual damages to the Debtor arising out of its inclusion in the C.P. Suit were proven in the instant record. We now further find no willful action to violate the discharge injunction action on the Movants' part. It is not proven that any more attorneys' fees have been expended in support of the meritorious defense of the Debtor's inclusion in the C.P. Suit than in support of the unsuccessful attempt of Stone and apparently the other three individual C.P. Suit defendants to insulate themselves from the Suit as well. Therefore, although an Order of Contempt under Federal Rule of Bankruptcy Procedure 9020(b), (c) may be an appropriate vehicle to enforce a violation of the discharge injunction, *see In re McNeil,* 128 B.R. 603, 614–15 (Bankr.E.D.Pa.1991), the instant Cross–Motion seeking such relief must be denied.

■ The parties also presented testimony, argued, and briefed the issue of whether the Movants' release of the Debtor and its officers, employees, etc., in the December 31, 1991, sale transaction was valid. It was very tempting to us to address this issue first as a means of resolving the entire underlying controversy between the parties on pertinent state-law grounds. However, we ultimately concluded that these issues are properly left to the pertinent state court forum, since that controversy will constitute one to which the Debtor will no longer be a party.

The Movants do not deny that the December 31, 1991, release was executed knowingly and intelligently by the Movants at the settlement table in the transaction in which they transferred their Ocean City franchise to Max. They recognized the release for what it was and basically understood its legal impact as a bar to further action against the Debtor and/or its officers and employees. They have argued, however, that they did not execute the release voluntarily, but under protest and therefore as a result of "economic duress," justifying its non-enforcement.

In its argument on this point, the Movants muster but two cases in support of their recitation of the relevant criteria for economic duress, *Seal v. Riverside Federal Savings Bank,* 825 F.Supp. 686, 695 (E.D.Pa.1993); and *Temp–Way Corp. v. Continental Bank,* 139 B.R. 299, 321 (E.D.Pa.), *aff'd,* 981 F.2d 1248 (3d Cir.1992). The Movants fail to further note that, in both of these cases, the respective courts refused to invalidate the respective contractual engagements on the basis of economic duress.

Unfortunately for the Movants, the facts of the December 31, 1991, transaction appear to mirror those of a case controlling on this court, *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975). *Three Rivers* involved, like the instant case, a franchisor-franchisee relationship. There, the franchisee was compelled to execute a broad, general release to a large auto manufacturer-franchisor as a condition of the manufacturer's buying back its parts. 522 F.2d at 887–88. Applying Pennsylvania state law in determining whether the franchisee's antitrust claims were barred by the release, *id.* at 892–93, the court concluded that "[d]uress is not established merely by showing that the release was given under pressure of the financial circumstances disclosed here," *id.* at 893, suggesting that some sort of physical coercion was necessary to sustain any such claim. *Id.* at 893–94. The court thus upheld the release, even in the face of additional claims by the franchisee that its executive officer did not understand that the release applied to antitrust claims. *See In re FRG, Inc.,* 121 B.R. 451, 547–58 (Bankr.E.D.Pa.1990) (releases are generally broadly construed). *Cf. Nevets C.M., Inc. v. Nissho Iwai American Corp.,* 726 F.Supp. 525, 535 (D.N.J.1989), *aff'd,* 899 F.2d 1218 (3d Cir.1990) (applying New Jersey law, court finds that a distributee who expressed dissatisfaction with the terms in a contract with a distributor, including a release, immediately after entering into the contract was nevertheless bound by the release).

The instant Movants undoubtedly felt pressured into signing the release of their claims against the Debtor in the transaction in which they sold their franchise. However, no physical coercion was imposed upon them. Moreover, this agreement appears to have been mere enforcement of terms to which they agreed when originally signing their franchise agreement. There was no evidence of any sort of coercion in the execution of that agreement. Furthermore, they received direct consideration for the December 31, 1991, release in the form of Max's assumption of their indebtedness to the Debtor. It is certainly not the law of Pennsylvania that a contracting party can avoid the unpleasant aspects of an integrated contractual undertaking simply because, at the time of contracting, that party felt pressured to agree to certain of the integrated terms which it deems onerous.

It therefore appears to us that the Movants have a weak claim in their remaining C.P. Suit against the Debtor's principals, at least under the facts presented to us. We submit this analysis as guidance to the parties and to possibly assist the overburdened state court in assessing the merits of a matter which we were obliged to hear, but in which we are obliged to delegate the decision-making authority to the state court.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 7th day of December, 1994, after a hearing of November 9, 1994, on the Motion to Open Pursuant to 11 U.S.C. Section 350(b) and Petition for a Declaratory Judgment" ("the Motion") of Michael and Marilyn Williams ("the Movants") and the Cross Motion of the Debtor for Contempt and Reimbursement of Fees and Costs ("the Cross–Motion"), it is hereby ORDERED AND DECREED as follows:

1. The instant bankruptcy case is REOPENED for disposition of the Motion and Cross–Motion, but shall be reclosed forthwith unless a timely appeal is taken from this Order.

2. It is DECLARED that all obligations of the Debtor to the Movants are DISCHARGED by the confirmation Order in

914

this case, but that the obligations of the Debtor's principals are NOT DISCHARGED by the said confirmation Order.

3. The Cross–Motion is DENIED.